COMMONWEALTH EDISON COMPANY, Plaintiff-Appellant, *v.* THE DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 79-1520

Opinion filed July 8, 1980.

Richard G. Ferguson, Laurence D. Lasky, Paul F. Hanzlik, and William P. Suriano, all of Chicago (Isham, Lincoln & Beale, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellees.

Frederick S. Lane and Ralph E. Loomis, of Chicago, and Dennis P. Ryan, of Waukegan (Sonnenschein, Carlin, Nath & Rosenthal, William Blumthal, and Robert Masini, of counsel), for *amici curiae.*

Mr. JUSTICE DOWNING delivered the opinion of the court:

Commonwealth Edison Company (Edison) appeals from an order of the circuit court of Cook County which affirmed a tax assessment made by the Department of Local Government Affairs (the Department) of Edison's pollution control facilities located in Cook County, Illinois.

On appeal, Edison contends that (1) the Department's assessment of the pollution control facilities did not comport with statutory provisions governing such assessments; and (2) the Department's valuation of the facilities denied Edison the right to uniform tax treatment and equal protection of the law.

Edison owns and operates 12 certified pollution control facilities in Cook County. Pursuant to section 21a—4 of the Revenue Act of 1939 (Ill. Rev. Stat. 1977, ch. 120, par. 502a—4), the Department of Local Government Affairs of the State of Illinois is empowered to assess certified pollution control facilities for tax purposes. Section 21a—1 of the Act (Ill. Rev. Stat. 1977, ch. 120, par. 502a—1) declares it to be the policy of this State that pollution control facilities be valued for property tax purposes "* * * in relation to 33 1/3% of the fair cash value of their economic productivity to their owners." Section 21a—3 (Ill. Rev. Stat. 1977, ch. 120, par. 502a—3) sets forth the method by which the Department is to assess these facilities as follows:

"For the purpose of determining 33 1/3% of the fair cash value of any certified pollution control facilities in assessing said facilities under the real and personal property tax laws of this State, the Department shall take into consideration the actual or probable net earnings attributable to the facilities in question, capitalized on the basis of their productive earning value to their owner; the probable net value which could be realized by their owner if the facilities were removed and sold at a fair, voluntary sale, giving due account to the expense of removal and condition of the particular facilities in question; and such other information as the Department may consider as bearing on 33 1/3% of the fair cash value, to their owner, of the pollution control facilities in question, consistent with the principles set forth herein."

In 1977, Edison filed separate annual tax returns with the Department for each of its 12 facilities. These returns contained information regarding the original and the present fair cash value of each facility. On the return the following question was asked: "Does the control facility have any enhancement to the manufactured product or is there a by-product derived from the control facility?" Edison answered "No" to this question for each of its facilities. The Department assessed Edison's facilities at 33 1/3% of their present fair cash value.

Edison applied to the Department for a review of the assessment, contending that the Department assessed the facilities ignoring the information provided by Edison on the Department's tax form which indicated that the pollution control facilities did not have any productive earning value to Edison and the Department's assessment did not comply with section 21a—3 of the Revenue Act of 1939.

At the hearing before the Department on this matter, Edison presented evidence indicating that their pollution control facilities were assessed at 33 1/3% of their present fair cash value, while the facilities owned by industries other than public utilities were assessed at rates between one-half of 1% to 3% of the facility's present fair cash value. There

was testimony that Edison's facilities did not aid in the production of electricity but in fact reduced operating efficiencies. Edison's witness, Dr. Langum, an economic consultant, defined "economic productivity" of property as the contribution by that property to the goods or services produced by that property and sold to customers. His understanding of the term "productive earning value" of property was the capitalized value to the owner of net earnings derived from the sale of goods or services produced by that property and sold to customers. He stated that pollution control facilities of an electric utility have no economic productivity because they make no contribution to the kilowatt hours of electricity produced and sold by the utility. He also stated that generally these facilities have no economic productivity to industrial firms either and in this respect there was no difference between pollution control facilities of a public utility and the facilities of an industrial firm.

Ralph Olsen, a staff auditor for the Illinois Commerce Commission, stated that Edison's pollution control facilities are included in its rate base on exactly the same basis as any other plant equipment and whatever is included in the rate base earns exactly the same rate of return.

Ron Deloney, an assessor for the Department, testified to the Department's understanding of the assessment guidelines set forth in section 21a—3. He stated that this section provided two methods of assessment, the cost approach, meaning the net salvage value of the equipment and the income approach, meaning capitalized earnings. He stated that nonregulated industries for the most part were assessed by the cost approach, whereas public utilities were assesssed on an income approach. He explained the difference on the basis that public utilities such as Edison include their pollution control facilities in their rate base, enabling them to recover the cost of the capital invesment in the facilities, and that because a rate of return valued in income was received, an income approach was used to value their pollution control facilities.

The Department confirmed its original assessment of Edison's facilities finding that Edison, in filing a request for a rate increase, uses the value of the pollution control facilities in the same fashion as the investment in the rest of the facility; that Edison is unique in that it is a monopoly and receives through rate increases additional revenues for the investment in pollution control facilities; that this guaranteed increase is not present with other industries and may not be possible in some cases; and that Edison's facilities produce an extra price increment on the electricity sold.

Edison then filed a complaint for administrative review in the circuit court. After examining the entire record of proceedings before the Department, the briefs and oral arguments of counsel, the circuit court affirmed the Department's assessment. The court found that the statutory

provisions were intended to exempt from taxation those pollution control facilities which did not produce anything of value to the owner, but that if the facility did produce a byproduct of value to the owner, that byproduct should be taxed. The court stated:

"In this case the by-product produced by reason of the pollution control facility is a certain and ascertainable increase in Edison's rate of return. The economic productivity to Edison here is cash which can and should be assessed and taxed."

Edison filed a timely notice of appeal from the circuit court's judgment. By order of this court, taxing bodies of Zion and the County of Lake were allowed to file a joint brief on appeal as *amici curiae* parties.

## I.

At issue here is the interpretation and application of sections 21a—1 and 21a—3 of the Revenue Act of 1939. This court is not bound by an agency's decision as to the legal effect of statutory words (*Ranquist v. Stackler* (1977), 55 Ill. App. 3d 545, 550, 370 N.E.2d 1198), rather the statutory interpretation of the meaning of terms presents a question of law for determination by the courts (*Illinois-Indiana Television Association v. Illinois Commerce Com.* (1973), 55 Ill. 2d 205, 209, 302 N.E.2d 334).

Edison argues that the term "economic productivity," as used in section 21a—1, concerns the ability of property to produce some physical output in the way of commodities or services sold to customers. This same concept, Edison argues, is embodied in the phrase "productive earning value" as used in section 21a—3. Edison maintains that a facility is "economically productive" and has "productive earning value" only when it is in fact productive, *i.e.*, when it increases the quantity of goods or services sold by its owner, reduces production costs, or enhances production. Therefore, Edison argues, because its pollution control facilities do not produce electricity, the goods or service it sells, they are not "productive" within the meaning of the statute. Edison also argues that the recovery of capital costs associated with the facilities do not make them economically productive; that all companies must recover the costs associated with their pollution control facilities; and that if cost recovery converts a pollution control facility into productive property, then all pollution control facilities are economically productive and the statute becomes meaningless.

The Department, on the other hand, argues that Edison's interpretation of the word "productive" to mean "productive of electricity" unduly restricts the statutory language, and that the inclusion of capital expenditures associated with the pollution control facilities in the base from which Edison's rates are determined adds to the production of income

for Edison and contributes to the actual or probable net earnings of Edison.

The *amici curiae* parties view section 21a—3 as including three approaches for the Department to consider in determining 33 1/3% of fair cash value of any certified pollution control facility. Summarily, they state those approaches to be: (1) the productive earning value of the facility to its owner; (2) its salvage value; and (3) other information consistent with the principles set forth therein. They argue that Edison misinterprets and relies on approach number one to the exclusion of the second and third approaches; that the second and third approaches do not require that the facility, in order to be taxable, must produce goods or services; and that the third approach is very broad and under it the Department had the right to consider "such other information" as Edison's increased revenues and earnings resulting from the inclusion of its pollution control facilities in its rate base.

The cardinal rule of statutory construction is that a statute must be construed so as to ascertain and give effect to the intention of the legislature. (*General Motors Corp. v. Industrial Com.* (1975), 62 Ill. 2d 106, 112, 338 N.E.2d 561.) The legislative intent should be primarily sought from the language used in the statute. (*Harvey Firemen's Association v. City of Harvey* (1979), 75 Ill. 2d 358, 363, 389 N.E.2d 151.) Words used in a statute must be given their popularly understood meaning or commonly accepted dictionary definition. (*Tuftee v. County of Kane* (1979), 76 Ill. App. 3d 128, 131, 394 N.E.2d 896.) The parties agree that a statute must be read as a whole giving effect to all of its provisions.

With these principles in mind, we must decide whether the inclusion of the cost of a pollution control facility in a regulated company's rate base renders that facility "economically productive" within the meaning of the terms used in sections 21a—1 and 21a—3. In accordance with these sections, the Department, when assessing pollution control facilities, must determine the facilities' "economic productivity to their owners," and in making this determination must consider the actual or probable net earnings attributable to the facilities in question capitalized on the basis of their productive earning value to their owners, their salvage value, and other information consistent with these principles.

Webster defines economic as "\* \* \* of, relating to, or concerned with the production, distribution, and consumption of commodities \* \* \* having practical or industrial significance, uses, or application \* \* \* operated or produced on a profitable basis: producing an excess of returns over expenditures \* \* \*." Productivity is defined as "\* \* \* the ability or capacity to produce \* \* \* abundance or richness in output \* \* \* the physical output per unit of productive effort \* \* \*." Earning is

defined as "* * * the balance of revenue for a specific period that remains after deducting related costs and expenses incurred * * *." Webster's Third New International Dictionary (1976).

It is undisputed that Edison's pollution control facilities do not actually "produce" or aid in the production of its product, electricity, or "produce" a saleable byproduct, or reduce production costs. The facilities, in fact, hinder Edison's production efficiencies. Including the cost of the facilities in Edison's rate base allows Edison the opportunity to recover its expenditures associated with the installation of the facilities. An unproductive pollution control facility adds nothing to earning capacity but simply represents a cost which must be recovered. All businesses whether they be regulated or unregulated must recover such costs and seek to do so by raising their prices.

The Department and *amici curiae* parties argue that Edison, a regulated company is assured the recovery of costs associated with the installation of pollution control facilities because these costs are included in its rate base; whereas an unregulated company is subject to competition and the market price and may not be able to raise its prices to recover its costs of installation.

Just as the market price controls the price unregulated companies may charge their customers, the Illinois Commerce Commission controls the price which Edison may charge its customers. There is no evidence in the record to show that each time Edison installed a pollution control facility and requested a rate increase, including the cost of installation in its rate base, that the Illinois Commerce Commission granted a rate increase. Nor are we aware of any set rule which so provides. The Illinois Commerce Commission could in fact refuse the rate increase. Nor does the evidence support a finding that a rate increase guarantees the cost of recovery of the installation of these facilities or any level of earnings. There is nothing in the record which indicates that Edison received an increase in rates as the direct result of the installation of its facilities. Such a theory is highly speculative and unsupported by the evidence.

■■■ The obvious function of a pollution control facility is to prevent pollution. The legislature has sought to encourage the installation of pollution control facilities by providing tax benefits to businesses which install such facilities. (See generally Use Tax Act, Ill. Rev. Stat. 1977, ch. 120, par. 439.1 *et seq.*; Service Use Tax Act, Ill. Rev. Stat. 1977, ch. 120, par. 439.31 *et seq.*; Retailers' Occupation Tax Act, Ill. Rev. Stat. 1977, ch. 120, par. 440 *et seq.*; Service Occupation Tax Act, Ill. Rev. Stat. 1977, ch. 120, par. 439.101 *et seq.*) The legislative intent to encourage expenditures that would result in environmental improvement and soften the tax burden on those who are required to make such expenditures is evident in sections 21a—1 and 21a—3. Under our interpretation of these sections,

pollution control facilities are to be taxed only to the extent that the facility produces a product or service sold which results in increased earnings to its owner. The Department's theory of assessment expands the language of these sections beyond that commonly understood to broaden the circumstances under which facilities may be assessed. We find this to be inconsistent with the legislative intent. We adhere to the rules of statutory construction which provide that taxing laws are to be strictly construed, are not to be extended beyond the clear import of the language used, and where there is any doubt in their application, they are to be construed most strongly against the government and in favor of the taxpayer. *Getto v. City of Chicago* (1979), 77 Ill. 2d 346, 359, 396 N.E.2d 544; *Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 567, 194 N.E.2d 257.

By amendment to section 21a—3, which became effective on January 1, 1980, the legislature clarified its intent as to when earnings may be attributed to a pollution control facility. The amended section retained the language of former section 21a—3 in its entirety and added the following:

"For the purposes of this Act, earnings shall be attributed to a pollution control facility only to the extent that the operation thereof results in the production of a commercially saleable by-product or increases the production or reduces the production costs of the products or services otherwise sold by the owner of such facility. * * *

This amendatory Act of 1979 is not intended to nor does it make any change in the meaning of any provision in this Section but is intended to remove possible ambiguities, thereby confirming the existing meaning of this Section in effect prior to the effective date of this amendatory Act of 1979." (Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.)

The amendment includes the word "by-product." Webster defines by-product as "* * * a secondary or additional product: something produced (as in manufacturing) in addition to the principal product * * *." (Webster's Third New International Dictionary (1976).) In this context, cash, in the form of cost recovery of the installation of a facility, cannot be said to be synonymous with the definition of byproduct. Based on the record we cannot agree with the trial court's consensus that "[t]he economic productivity to Edison here is cash * * *."

The Department and *amici curiae* parties argue that this amendment may not be retroactively applied to ascertain legislative intent and has prospective application only, relying on *Roth v. Yackley* (1979), 77 Ill. 2d 423, 396 N.E.2d 520. Although our decision is not dependent upon the application of this amended section, we recognize the principle that an

amendatory act is ordinarily construed only as prospective, unless it contains express language declaring it to be retroactive. (*Board of Trustees v. Illinois Community College Board* (1978), 63 Ill. App. 3d 969, 974, 380 N.E.2d 988.) The amendment is a declaration of the legislature's prior intent with regard to when earnings may be attributable to pollution control facilities giving the amendment a retroactive effect. This intent is consistent with the question posed by the Department itself on its tax forms submitted by Edison, that question being, "Does the control facility have any enhancement to the manufactured product or is there a byproduct derived from the control facility?" Unlike the *Roth* case, this amendment does not alter the clear import of the prior statutory language nor contradict a court's interpretation of that language made prior to the passage of the amendment.

Because we have found that the Department's assessment of Edison's pollution control facilities did not comport with sections 21a—1 and 21a—3 of the Revenue Act of 1939, it is not necessary to discuss the constitutional issue raised by Edison. *Jamaica Inn, Inc. v. Daley* (1978), 72 Ill. 2d 415, 420, 381 N.E.2d 694.

The judgment of the circuit court of Cook County is reversed.

Reversed.

PERLIN, P. J., and STAMOS, J., concur.