**SENIOR CITIZENS COALITION OF NORTHEASTERN MINNESOTA,**
Appellant,

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent.**

**MINNESOTA POWER & LIGHT COMPANY, Appellant,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent,**

and

**Attorney General Hubert H. Humphrey III, Respondent.**

Nos. C9–83–982, C9–83–1047.

Supreme Court of Minnesota.

Sept. 7, 1984.

---

James R. Habicht, Duluth, Samuel L. Hanson, R. Scott Davies, Terry L. Slye, Minneapolis, Dale W. Lucas, Duluth, for Senior Citizens Coalition.

Karl W. Sonneman and Allen E. Giles, St. Paul, for Mn. Pub. Utilities Comm.

Michael J. Bradley, St. Paul, for Hubert H. Humphrey III.

SCOTT, Justice.

Two cases have been consolidated for disposition on this appeal. Both cases arose out of Minnesota Power & Light Company's (MPL) 1981 application for a rate increase. Each case involves an appeal from a judgment entered in Ramsey County District Court, affirming a decision of the Minnesota Public Utilities Commission (PUC).

In C9–83–1047, MPL appeals from that part of the PUC's decision which excluded from the rate base MPL's investment in recreational facilities which are being constructed at certain hydroelectric projects pursuant to licensing requirements of the Federal Energy Regulatory Commission (FERC).[1] In C9–83–982, the Senior Citizens Coalition of Northeastern Minnesota appeals from that part of the PUC's decision denying its request for intervenor compensation. We affirm in C9–83–982, but reverse in C9–83–1047. Because each case raises distinct issues, they will be discussed separately below.

I. *C9–83–1047.*

MPL operates hydroelectric facilities located on navigable waters in Blanchard, Winton, and Island Lake, Minnesota. To construct and operate those facilities, MPL had to obtain a license from the FERC, which has exclusive jurisdiction under the Federal Power Act to license hydroelectric facilities on navigable waters and to set standards for the licensing process. *See* 16 U.S.C. § 803 (1983); *Town of Springfield v. McCarren,* 549 F.Supp. 1134, 1156–57 (D.Vt.1982), *aff'd by order,* 722 F.2d 728 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 360, 78 L.Ed.2d 322 (1983); *see generally* 2 A. Priest, *Principles of Public Utility Regulation* 613–39 (1969). In applying for such a license, MPL was required to file a suitable plan for project recreational facilities. That plan was identified as "Exhibit R" of the application.[2] Forrest L. Ludsen, a company witness, testified that the recreational "facilities become project facilities by incorporation" of that exhibit into the license[3] and that "[t]he license requires that the project area and work must be in substantial conformity with the approved exhibit."

Federal regulations, as well as decisions by the FERC, establish a licensee's duty to develop the planned recreational facilities. According to federal regulations, the FERC expects the licensee to assume responsibility for developing "suitable public recreational facilities upon project lands and waters." 18 C.F.R. § 2.7(b) (1983).[4] Mean-

---

1. The functions of the Federal Power Commission relating to hydroelectric facilities were transferred to the Federal Energy Regulatory Commission in 1977. *See* Pub.L. No. 95–91, 91 Stat. 565 (1977) (16 U.S.C. § 792 (Supp.1983)). "FERC" will be used to refer to both the Federal Energy Regulatory Commission and its predecessor.

2. In November of 1981, the FERC amended its regulations and consolidated the number of exhibits which must be attached to a license application. *See* 46 Fed.Reg. 55926 (1981). As a result, former "Exhibit R" is now part of "Exhibit E." *See* 46 Fed.Reg. at 55927 (codified at 18 C.F.R. § 4.41(f)(7)).

3. *See, e.g., Connecticut Light and Power Co.,* 24 FERC ¶ 62,055 (CCH) (1983).

4. Regulation 2.7, entitled "Recreational development at licensed projects," was promulgated as part of a general policy statement issued by the commission on December 27, 1965. *See* 30 Fed. Reg. 16197–98 (1965). By that order, the commission additionally required the licensee to assume responsibility for, among other things, acquiring sufficient land "to assure optimum development of recreational resources afforded by the project." *Id.* at 16198. The commission further recognized that "a license will incur costs in providing recreational facilities, and,

while, the FERC has held that a licensee has ultimate responsibility for recreational development and that it retained sole authority to determine, upon a licensee's petition, "whether a particular level of [recreational] demand attained is or is not adequate to justify proceeding with the planned development." *Public Utility District No. 1 of Chelan County, Washington,* 56 Fed. Power Comm. 787, 789 (1976).

In May of 1981, MPL petitioned for a rate increase. It sought to include in the rate base, as part of its investment in the three hydroelectric plants, the cost of constructing the public recreational facilities described in the license application for each plant. The Office of Consumer Services objected to including that investment in MPL's rate base on the ground that such facilities were not "used and useful in rendering service" within the meaning of Minn.Stat. § 216B.16, subd. 6 (1982).[5] MPL countered that its investment in the recreational facilities was properly includable in the rate base because such facilities are a condition of the license under which it operates the hydroelectric plants and, therefore, they are necessarily "used and useful."

The hearing examiner agreed with MPL and recommended that MPL be allowed to include that investment in its rate base. The PUC reversed the hearing examiner, ruling that federal law did not compel inclusion of that investment in the rate base and that the recreational facilities were not "used and useful." On appeal, the Ramsey County District Court affirmed the PUC's decision, ruling that substantial evidence supported its conclusion. MPL appeals to this court, challenging the PUC's failure to include the costs of constructing the recreational facilities in its rate base. We reverse.

▪ Since MPL is attempting to have its retail ratepayers pay for the costs of constructing recreational facilities which are required as a condition of the hydroelectric license granted by the FERC, this case involves the interaction of the federal and state spheres in utility regulation. It is well established that the FERC has plenary jurisdiction over regulating wholesale interstate transactions, while state utilities commissions retain authority to regulate intrastate retail rates. *See Federal Power Commission v. Southern California Edison Co.,* 376 U.S. 205, 214–15, 84 S.Ct. 644, 650–51, 11 L.Ed.2d 638 (1964); *Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.,* 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 54 (1927). This court recently applied those principles in *Northern States Power Co. v. Minnesota Public Utilities Commission,* 344 N.W.2d 374 (Minn.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3546, 82 L.Ed.2d 850 (1984). There, we held that a FERC decision established a wholesale interstate rate and, therefore, the PUC had no power to reexamine the reasonableness of that FERC-approved rate. *Id.* at 377, 382. As a result, even though the FERC-approved rate did "not directly establish the return for retail rates," the PUC was required to accept the FERC-approved rate as establishing expenses for purchased power in determining intrastate retail rates. *Id.* at 382.

▪ The instant case, however, does not involve an interstate wholesale rate established by the FERC. Rather, the question presented here is whether the PUC must include in the intrastate rate base costs incurred as a condition of the hydroelectric license granted by the FERC. As MPL concedes, the PUC correctly ruled that this question must be resolved under state law standards.

therefore, will allow appropriate and reasonable expenditures for recreational facilities, including the purchase of additional land, to be included as part of the project cost." *Id.* at 16198; *see* 18 C.F.R. § 2.7.

5. Effective July 1, 1983, the responsibilities of the Office of Consumer Services in utility matters were transferred to the Attorney General's Office. Act of June 7, 1983, ch. 289, § 26, 1983 Minn.Laws 1246, 1260–61. Hence, the Attorney General is one of the named respondents in this case.

Under section 216B.16, subd. 6, a utility is entitled to a reasonable return on its investment in "property used and useful in rendering service to the public." The PUC excluded MPL's investment in the recreational facilities from the rate base, ruling that those facilities were not "used and useful" because:

MPL made no showing that the facilities were actually used in the generation of electricity. They are not part of MP & L's generation, transmission, or distribution facilities. If the recreational facilities were to vanish, there would be no effect on the output of MP & L's hydroelectric facilities. * * * It may well be that the recreational facilities are useful in rendering electric service, if they are seen as a part of the overall hydroelectric facility. However, M.S. § 216B.16, subd. 6, requires the investment to be both used and useful, and the recreational facilities clearly are not both.

In sum, while seemingly recognizing that such facilities could "well be" considered "useful" due to their mandatory nature, the PUC excluded MPL's investment in the recreational facilities from the rate base on the ground that such facilities were not "used * * * in rendering service to the public."

 We think that the PUC erroneously applied the "used and useful" standard. The problem with the PUC's reasoning is that it defined "used * * * in rendering service" to require that an item must actually generate, transmit or distribute electricity, or aid in doing so. We reject that definition as being overly technical and inflexible. As MPL points out, mandated pollution control facilities, which serve to preserve and protect the environment, are routinely considered "used and useful," and thus included in a utility's rate base, even though such devices do not produce or

distribute electricity, or aid in doing so. *See Green v. Pennsylvania Public Utility Commission,* 473 A.2d 209, 214 (Pa. Commw.1984); *Pennsylvania Public Utility Commission v. Pennsylvania Power and Light Co.,* 55 P.U.R.4th 185, 193–94 (1983); *In re Indiana & Michigan Electric Co.,* Case No. U–6148 [1979–81] Util.L. Rep.-State (CCH) ¶ 23,377.06 (1981); *see also Commonwealth Edison Co. v. Department of Local Government Affairs,* 86 Ill.App.3d 768, 773, 41 Ill.Dec. 841, 844, 408 N.E.2d 263, 266 (1980), *aff'd,* 85 Ill.2d 495, 55 Ill.Dec. 492, 426 N.E.2d 817 (1981); *AFL–CIO, Central Labor Council of Vanderburgh, Posey and Warrick Counties v. Southern Indiana Gas and Electric Co.,* 443 N.E.2d 1243, 1247–48 (Ind.App.1983). Under general principles of utility law, the "used and useful" standard simply requires (1) that the property be "in service," and (2) that it "be 'reasonably necessary' to the efficient and reliable provision of utility service." *City of Evansville v. Southern Indiana Gas and Electric Co.,* 167 Ind. App. 472, 515–20, 339 N.E.2d 562, 589–91 (1975); *see also Public Service Commission v. Diamond State Telephone Co.,* 468 A.2d 1285, 1290 (Del.1983); *see generally* 1 A. Priest, *supra,* at 174–77; 73B C.J.S. *Public Utilities* § 24, at 187–91 (1983). Thus, where, as here, an item of property is necessary for the continued operation of an electric generating facility according to valid federal licensing standards, we hold that such an item is "used and useful" within the meaning of section 216B.16, subd. 6.[6] *Cf. Green,* 473 A.2d at 214 (held pollution control devices were "used and useful" where such equipment was necessary for continued operation of plants according to a federal consent decree).

 Respondents, however, contend that the recreational facilities cannot be considered "used and useful" because fed-

---

**6.** Respondents claim that a decision by the New York Public Service Commission supports the PUC's ruling that MPL's investment in recreational facilities cannot be included in the rate base. *See In re Rochester Telephone Co.,* 40 P.U.R.4th 331, 355 (1980). In that case, the New York Commission disallowed a utility's invest-

ment in a park which it had dedicated to public use. That case is inapposite because the utility involved there was not required to provide the park, while MPL is required to develop the recreational facilities at issue here pursuant to a federal licensing standard.

eral regulations allow a utility to cooperate with other government agencies or organizations in providing the facilities, or it may charge reasonable user fees to assist in defraying the cost of providing the facilities. *See* 18 C.F.R. §§ 2.7, 4.41(f)(7)(ii).[7] As an initial matter, the PUC did not in any way base its decision on this reasoning. Moreover, we find no merit to that argument in this case. While a utility may have several alternatives with respect to financing the recreational facilities, it is clear that the utility has ultimate responsibility to provide the facilities. Where, as here, the utility has incurred costs in providing an item which is required for continued operation of a plant pursuant to valid federal licensing standards, it is irrelevant that other potential sources of funding may have existed. That item is "used and useful," and, hence, the utility's costs in providing that item must be included in the rate base.

II. *C9-83-982.*

The Senior Citizens Coalition of Northeastern Minnesota (Senior Citizens) intervened in this rate case before the PUC. On July 23, 1981, shortly after their intervention, the PUC issued a "Statement of Policy" concerning the awarding of attorney fees and costs to intervenors. While the PUC recognized in that statement that its "legal authority to award compensation to rate case intervenors [had] not been settled," it "decided to issue [the] statement in an effort to provide potential intervenors insight as to the manner in which [it] intends to proceed when faced with requests for compensation." According to that statement, the PUC planned to "consider requests for compensation from intervenors in all significant contested cases." "Consideration for an award of compensation [was] contingent on compliance with the procedural provisions of [the] Policy Statement." As a result of their participation, the Senior Citizens incurred expenses including, as claimed by the Senior Citizens, attorney fees, organizational expenses and expert witness fees, and they requested the PUC to order MPL to pay for those expenses.

While this matter was pending before the PUC, it issued a revised "Statement of Policy on Intervenor Compensation" on July 20, 1982. It stated therein that it would no longer entertain requests for attorney fees and costs ("intervenor compensation") because it had no authority to do so. One commissioner dissented on the ground that the PUC had granted intervenor compensation in the past "largely" based on provisions in the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601 et seq. (1983), and that it should continue to do so.

On August 2, 1982, the PUC issued its Order after Reconsideration, denying the Senior Citizens' request for intervenor compensation on the ground that it lacked authority to grant such relief. On appeal, the Ramsey County District Court affirmed the PUC's decision on the same ground. The Senior Citizens now appeal to this court. We affirm.

The following issues are raised:

(1) Whether the PUC had authority to award intervenor compensation under state law.

(2) Whether the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601 et seq., authorizes the PUC to award intervenor compensation independent of any state authority to do so.

(3) Whether the PUC should be estopped from refusing to consider the Senior Citizens' request for intervenor compensation in accordance with its past policy.

---

**7.** 18 C.F.R. § 2.7 provides: "The Commission [FERC] will not object to licensees and operators of recreational facilities within the boundaries of a project charging reasonable fees to users of such facilities in order to help defray the cost of constructing, operating, and maintaining such facilities." 18 C.F.R. §§ 2.7(e) and 4.41(f)(7)(ii) recognize that others may provide the necessary facilities. Regulation 4.41(f)(7)(ii) provides in part: "When public recreation facilities are to be provided by other entities, the applicant and those entities should enter into an agreement on the type of facilities to be provided and the method of operation."

■ 1. The PUC is a state agency of statutory origin. *See* Minn.Stat. § 216A.01 (1982). As such, it has only that jurisdiction conferred to it by the legislature. *See McKee v. County of Ramsey*, 310 Minn. 192, 195, 245 N.W.2d 460, 462 (1976); *State ex rel. Spurck v. Civil Service Board*, 226 Minn. 253, 259, 32 N.W.2d 583, 586 (1948). "A lack of statutory authority betokens a lack of jurisdiction." *State ex rel. Spurck*, 226 Minn. at 259, 32 N.W.2d at 586. Thus, an administrative agency's decision would be void or subject to collateral attack if the decision was rendered either without statutory authority or in excess of the authority granted. *Id.*

The PUC ruled that it could not award intervenor compensation because it lacked express statutory authority to do so.[8] Nevertheless, the Senior Citizens assert that the legislature has granted the PUC broad powers to accomplish its purposes and that those broad powers impliedly authorized the PUC to award intervenor compensation in this matter. *See* Minn.Stat. §§ 216A.05, subd. 1, and 216B.08 (1982).[9]

■ In general, subject to certain exceptions not relevant here, a party is entitled to an award of attorney fees only where specifically authorized by statute or private agreement. *Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association*, 294 N.W.2d 297, 311 (Minn.1980).[10] "The power to authorize the award of attorneys' fees and other legal costs in cases tried before administrative bodies is generally accepted as a fundamental legislative prerogative." *Mountain States Telephone and Telegraph Co. v. Public Utilities Commission*, 195 Colo. 130, 134, 576 P.2d 544, 547 (1978). The existence of such legislative authority would enable an agency to promulgate intervenor funding rules. Pursuant to Minn.Stat. §§ 216A.05, subd. 1, and 216B.08, the PUC has been granted broad legislative powers in public utility matters and, prior to 1983, the legislature had not statutorily restricted it in the matter of awarding attorney fees and other legal costs.[11] Thus, it could be argued that the PUC had been delegated the legislative power to promulgate intervenor funding rules. *See Mountain States Telephone*

---

**8.** The Minnesota Legislature recently authorized the PUC to "order a utility to pay all or a portion of a party's intervention costs not to exceed $20,000 per intervenor in any proceeding when the commission finds that the intervenor has materially assisted the commission's deliberation and the intervenor has insufficient financial resources to afford the costs of intervention." Act of June 7, 1983, ch. 289, § 104, 1983 Minn.Laws 1246, 1301–02 (effective July 1, 1983). The PUC argues that the recent legislation evinces, by negative implication, that it previously did not have power to award intervenor compensation. We need not consider whether that enactment is dispositive of this issue, since we are upholding the PUC's decision on other grounds.

**9.** Minn.Stat. § 216A.05, subd. 1, provides that the "functions of the commission shall be legislative and quasi-judicial in nature." It further provides that the commission "may make such investigations and determinations, hold such hearings, prescribe such rules, and issue such orders with respect to the control and conduct of the businesses coming within its jurisdiction as the legislature itself might make but only as it shall from time to time authorize." Minn. Stat. § 216B.08 provides:

The commission is hereby vested with the powers, rights, functions and jurisdiction to regulate in accordance with the provisions of Laws 1974, Chapter 429 every public utility as defined herein. The exercise of such powers, rights, functions, and jurisdiction is prescribed as a duty of the commission. The commission is authorized to make rules and regulations in furtherance of the purposes of Laws 1974, Chapter 429.

**10.** There are three well established equitable exceptions to that general rule, known as the common fund, the substantial benefit and private attorney general theories. *See Consumer Lobby Against Monopolies v. Public Utilities Commission*, 25 Cal.3d 891, 907, 160 Cal.Rptr. 124, 133, 603 P.2d 41, 50 (1980). Those theories, however, are inapplicable in ratemaking proceedings. *Id.* at 911, 160 Cal.Rptr. at 135, 603 P.2d at 52. Another exception generally exists where a suit is brought in bad faith. *See Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association*, 294 N.W.2d 297, 311 (Minn.1980). There is no claim that that exception should be applied here.

**11.** The PUC must now award intervenors' costs within the guidelines set forth in Minn.Stat. § 216B.16, subd. 16 (Supp.1983). *See* note 8, *supra.*

*and Telegraph Co.,* 195 Colo. at 134–35, 576 P.2d at 547–48. *Contra Idaho Power Co. v. Idaho Public Utilities Commission,* 102 Idaho 744, 750, 639 P.2d 442, 449 (1981) (held that statutes conferring broad powers upon commission in furtherance of its regulatory powers did not empower it to promulgate intervenor funding rules or to award attorney fees in the absence of specific statutory authorization).

However, we need not decide whether the legislature implicitly delegated to the PUC the legislative authority to establish a system for compensating intervenors. The problem here is that, even if the PUC had authority to do so, it failed to properly exercise that authority. To have the force and effect of law, an agency's rules must be adopted pursuant to the formal rulemaking procedures of the Administrative Procedure Act (APA), Minn.Stat. §§ 14.01 to 14.70 (1982 & Supp.1983). *See Swenson v. Department of Public Welfare,* 329 N.W.2d 320, 324 (Minn.1983); *McKee v. Likins,* 261 N.W.2d 566, 576–78 (Minn.1977). While the PUC issued a "Statement of Policy" regarding intervenor compensation on July 21, 1981, the Senior Citizens concede that the policy statement was not promulgated pursuant to the APA. Therefore, it could not have the force and effect of law. Lacking a validly promulgated rule, the PUC had no authority to award intervenor compensation under state law. Accordingly, we uphold the PUC's ruling that it lacked authority to award intervenor compensation under state law in this case.

2. The Senior Citizens next argue that the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 2601 et seq., authorizes the PUC to award intervenor compensation independent of any state authority to do so. PURPA serves to encourage "(1) conservation of energy sup-

plied by electric utilities; (2) the optimization of the efficiency of use of facilities and resources by electric utilities; and (3) equitable rates to electric consumers." 16 U.S.C. § 2611. Subchapter II of the Act (16 U.S.C. §§ 2621–2627) sets forth ratemaking and utility service standards designed to further the purposes of the Act. None of the standards set forth in PURPA are binding upon the states. Yet, it requires state regulatory authorities to consider whether the suggested standards are appropriate under the conditions facing state utilities and consumers. *See* 16 U.S.C. §§ 2621(a) and 2623(a). *See generally Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (upheld PURPA's Titles I and III, and § 210 of Title II, against facial constitutional challenges under the commerce clause and U.S. Const., amend. X).

Subchapter III of the Act (16 U.S.C. §§ 2631–2633) is the statutory focus of this case. Section 2631 establishes the right of electric consumers to intervene and participate in rate-related proceedings conducted by a state regulatory authority in order to further the purposes of the Act.[12] Section 2632(a)(1) encourages intervention by requiring an electric utility "to compensate [a] consumer * * * for reasonable attorneys' fees, expert witness fees, and other reasonable costs incurred in preparation and advocacy," if the electric consumer "substantially contributed to the approval, in whole or in part, of a position advocated by such consumer * * * and relating to any standard set forth in subchapter II" of the Act. Compensation may be collected pursuant to section 2632(a)(2), which provides in relevant part:

A consumer entitled to fees and costs * * may collect such fees and costs from an

**12.** Section 2631(a) provides:
In order to initiate and participate in the consideration of one or more of the standards established by subchapter II of this chapter or other concepts which contribute to the achievement of the purposes of this chapter, the Secretary, any affected electric utility, or any electric consumer of an affected electric

utility may intervene and participate as a matter of right in any ratemaking proceeding or other appropriate regulatory proceeding relating to rates or rate design which is conducted by a State regulatory authority (with respect to an electric utility for which it has ratemaking authority) or by a nonregulated electric utility.

electric utility by bringing a civil action in any State court of competent jurisdiction, unless the State regulatory authority * * * has adopted a reasonable procedure pursuant to which such authority * * * (A) determines the amount of such fees and costs, and (B) includes an award of such fees and costs in its order in the proceeding.

The Senior Citizens argue that section 2632 confers jurisdiction on the PUC to award intervenor compensation and that the statute preempts this field of regulation. One court has rejected similar arguments. *See Idaho Power Co.*, 102 Idaho at 753, 639 P.2d at 451. The *Idaho Power Co.* court stated that the language of the statute neither confers authority on the state commission to promulgate intervenor funding rules nor does it require them to do so. *Id.* at 753, 639 P.2d at 451. In other words, even if PURPA authorized the commission to award intervenor compensation in PURPA-related matters, the exercise of that authority was dependent upon the existence of enabling state law. The court stated that the "permissive language [of the statute] is irreconcilable with the applicability of the doctrine of federal preemption in this instance." *Id.* at 754, 539 P.2d at 452. That court held that the Idaho commission had no authority under state law to promulgate intervenor funding rules and that PURPA did not independently grant authority to the commission to do so. *Id.*

We agree with the Idaho Supreme Court's construction of section 2632. Thus, as applied here, the PUC could award intervenor compensation under PURPA only if it had promulgated valid intervenor funding rules pursuant to enabling state law. As discussed previously, even if the PUC had authority under Minnesota law to promulgate intervenor funding rules, it failed to properly do so. Accordingly, we hold that the PUC correctly ruled it had no authority to award intervenor compensation under the PURPA provisions in question.

▮▮▮ Our holding does not necessarily deprive the Senior Citizens of their ability to secure intervenor compensation for participation in this ratemaking proceeding. It only denies them their compensation by order of the PUC. Section 2632(a)(2) provides an additional method of obtaining compensation: the Senior Citizens could bring a civil action against MPL in district court to have the district court determine whether they are entitled to intervenor compensation pursuant to section 2632 and, if so, how much. We note, however, that the Senior Citizens' ability to bring such an action is not before this court, and we make no comment thereon.

3. Finally, the Senior Citizens contend that the PUC should be estopped from refusing to consider their request for intervenor compensation, claiming they justifiably relied to their substantial detriment on the PUC's past unwritten practice of awarding intervenor compensation and the written statement of policy regarding intervenor compensation issued during the pendency of these proceedings before the PUC.[13] We disagree.

As discussed previously, the PUC had no authority to award intervenor funding, lacking valid rules promulgated pursuant to the APA. While the Senior Citizens admit that the written policy statement was not promulgated pursuant to the APA and that it therefore lacked the force and effect of law, they nevertheless contend that the PUC should be estopped from refusing to enforce that policy. In effect, the Senior Citizens would have this court confer authority upon the PUC by means of estoppel.

▮▮▮▮ Where an agency has no authority to act, agency action cannot be made effective by estoppel. *See Transport Workers of America, Local 223, AFL–CIO v. Transit Authority of the City of Omaha*, 205 Neb. 26, 30, 286 N.W.2d 102, 105 (1979); *Bair v. Blue Ribbon, Inc.*,

---

13. While that written statement of policy provided that the PUC would consider requests for intervenor compensation duly filed in accordance with the procedures set forth therein, it also recognized that the PUC's authority to award intervenor compensation had not been settled.

256 Iowa 660, 665, 129 N.W.2d 85, 88 (1964). That rule rests on the principle that jurisdiction neither attaches nor is lost on equitable principles; it is purely a matter of statute. *Cunningham v. Iowa Department of Job Service,* 319 N.W.2d 202, 204 (Iowa 1982). The Senior Citizens have failed to forward any reason why that principle should not be applied here. Thus, we reject the Senior Citizens' estoppel argument as being inapplicable to the circumstances presented.

Affirmed as to C9–83–982; reversed as to C9–83–1047.