*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0528**

Sierra Club, et al.,
Petitioners,

vs.

Public Utilities Commission,
Respondent.

**Filed January 26, 2026
Rule declared invalid
Schmidt, Judge**

Office of Administrative Hearings
File No. OAH 24-2500-39977

David C. Bender, Jessamine De Ocampo (pro hac vice), Earthjustice, San Francisco, California; and

Curtis Zaun, Minnesota Solar Energy Industries Association, St. Paul, Minnesota (for petitioners)

Keith Ellison, Attorney General, Susan C. Gretz, Jeffrey K. Boman, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Ryan P. Barlow, Katherine J. Marshall, Moss & Barnett P.A., Minneapolis, Minnesota (for amicus curiae Utility Group)

Considered and decided by Bratvold, Presiding Judge; Schmidt, Judge; and Bentley, Judge.

**SCHMIDT**, Judge

Petitioners Sierra Club, Vote Solar, Union of Concerned Scientists, and the Minnesota Solar Energy Industries Association (together, Sierra Club) appeal from a decision by an administrative-law judge (ALJ) that dismissed their petition for a declaration that respondent Minnesota Public Utilities Commission (the PUC) is enforcing a 2010 order as though it were a duly adopted rule. Because the PUC lacked authority to issue the 2010 order, which the parties agree is a rule, we declare that rule invalid.

## FACTS

In 2009, the Federal Energy Regulatory Commission (FERC) issued a rule, 18 C.F.R. § 35.28(g)(1)(iii) (2009), allowing Aggregators of Retail Customers (ARCs) to pay utility customers to reduce their electricity usage during periods of high demand. ARCs then sell the usage reductions into the wholesale energy market for a profit as a substitute for additional generation when generation prices are highest.

The FERC rule would require the independent system operator for Minnesota, the Midcontinent Independent System Operator, to begin accepting demand-response bids from ARCs unless "the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an [ARCs]." 18 C.F.R. § 35.28(g)(1)(iii) (2025).

In 2010, the PUC, acting as "the relevant electric retail regulatory authority," opened an informal investigation "to determine how it should exercise its responsibilities under the new FERC rule." The PUC issued a notice of comment period to approximately 150

individuals and entities, requesting input on what action it should take. Ten entities filed written comments, and two entities offered comments at a hearing. At the conclusion of the hearing, the PUC voted to issue an order prohibiting ARCs from submitting bids of demand response.

The PUC order (the 2010 order) "prohibits the demand response of the retail customers of Xcel Energy, Minnesota Power, Interstate Light and Power, and Otter Tail Power from being bid into organized markets by non-utility aggregators of retail customers."

In 2022, the PUC issued another notice of comment period, seeking input about whether "the [PUC] [should] take action related to third party aggregation of retail customers" and whether "the [PUC] [should] permit [ARCs] to bid demand response into organized markets." Comments received questioned whether the PUC had the authority to issue the 2010 order, whether ARCs constitute public utilities, and what oversight authority the PUC may have if ARCs are not public utilities. Eight months later, the PUC voted to "table" consideration of the issues raised during the second notice of comment period, which left the 2010 order in place.

In 2024, Sierra Club petitioned the Office of Administrative Hearings (OAH)[1] to declare that the PUC is enforcing the order as an unpromulgated rule without having

_____

[1] OAH is now known as the Court of Administrative Hearings.

followed the appropriate rulemaking procedures. Sierra Club also argued that the prohibition order exceeded the PUC's statutory authority.[2]

The ALJ denied Sierra Club's petition, determining that the PUC was not required to use the rulemaking procedures when it issued the 2010 order. Sierra Club appeals.

**DECISION**

There are five issues before this court. First, the parties dispute whether Sierra Club has standing to seek a declaratory judgment. Second, Sierra Club asks us to declare that the prohibition order is an invalid, unpromulgated rule. Third, the parties disagree about what standard of review applies to the second issue. Fourth, Sierra Club argues that the ALJ erred when it determined that the PUC was exempt from the rulemaking requirements of the Minnesota Administrative Procedure Act (MAPA). Minn. Stat. §§ 14.001-.69 (2024). Fifth, Sierra Club argues that the PUC exceeded its authority when it issued the 2010 order.

We conclude that Sierra Club has standing, and that the PUC exceeded its authority when it issued the order. As such, we need not address the remaining issues.

**I. Sierra Club has standing.**

The parties dispute whether Sierra Club has standing to seek declaratory judgment under Minnesota Statutes section 14.44. Standing is a jurisdictional prerequisite, which this court reviews de novo. *Scheffler v. City of Anoka*, 890 N.W.2d 437, 451 (Minn. App.

---

[2] Sierra Club did not seek relief from the OAH on that claim because Minnesota Statutes section 14.381 (2024) does not authorize OAH to find that unpromulgated rules exceed agencies' statutory authority. Instead, Sierra Club included the argument in its petition to preserve the issue for appeal.

4

2017), *rev. denied* (Minn. Apr. 26, 2017). A party has standing when it has suffered an injury-in-fact or when it "is the beneficiary of some legislative enactment granting standing." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 624 (Minn. 2007). Under the doctrine of associational standing, "an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *see also State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 497-98 (Minn. 1996).

The parties agree that the 2010 order constitutes a "rule." Section 14.44 governs standing for petitions for declaratory judgment on the validity of an agency's rule:

> The validity of any rule may be determined upon the petition for a declaratory judgment thereon, addressed to the court of appeals, when it appears that the rule, or its threatened application, interferes with or impairs, or threatens to interfere with or impair the legal rights or privileges of the petitioner. The agency shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, and whether or not the agency has commenced an action against the petitioner to enforce the rule.

Minn. Stat. § 14.44. "[T]o establish standing under section 14.44, a petitioner must demonstrate (1) a direct interest in the rule that is different in character from that of the citizenry in general; (2) the alleged harm is not speculative or hypothetical; and (3) the alleged harm is uniquely attributable to the rule." *Minnesota Voters All. v. State*, 955 N.W.2d 638, 642 (Minn. App. 2021).

The PUC argues that Sierra Club lacks standing because it cannot meet the requirements of the three-step test established in *Minnesota Voters Alliance*. We disagree.

5

First, the PUC asserts that Sierra Club's "claimed interests are no different from those of the citizenry in general." But a common injury may be shared by many and still be concrete and particularized to each injured person. *See Massachusetts v. EPA*, 549 U.S. 497, 517, 522 (2007) (explaining that a widely shared injury—there, climate change—can be concrete and particularized "no[] matter how many persons have been injured" (quotation omitted)). Sierra Club's contention that millions of Minnesotans allegedly pay higher utility bills or lose opportunities to participate in a wholesale market for demand response means only that the injury is common; it does not, as the PUC argues, convert those individual injuries into a grievance of the citizenry in general. The first requirement under *Minnesota Voters Alliance* is satisfied.

Second, the PUC asserts that Sierra Club has "demonstrated at most only speculative or hypothetical injury." But the PUC cites no legal basis for its assertion that customers must be aware of their injury to have standing. Sierra Club's members' injuries are not speculative or hypothetical. Sierra Club has demonstrated that their members have been denied participation in the wholesale demand response market and, thus, have been denied compensation and lower utility rates. The second requirement under *Minnesota Voters Alliance* is satisfied.

Third, the PUC argues that Sierra Club failed to meet the third *Minnesota Voters Alliance* requirement because "[c]ustomers can and do participate in demand response through regulated utility programs," so the alleged harm "cannot be traced entirely to the 2010 Order." Again, the PUC cites no legal basis for the assertion that the availability of other demand response programs negates the particularized harm caused by its order.

6

We agree with Sierra Club that associational standing requires only that "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Sierra Club summarizes the point succinctly:

> The fact that at least one of [Sierra Club's] members would participate in federal wholesale power markets but for the Prohibition Order is sufficient. So is the fact that at least one member pays a utility bill that is higher than it would be if the Prohibition Order hadn't banned competition in wholesale markets. Or the fact that at least one [Minnesota Solar Energy Industries Association] member would provide demand response aggregation services to customers but for the PUC's Prohibition Order banning them. Any of these injuries is sufficiently concrete for standing; nothing more is required.

Since the alleged harm is uniquely attributable to the rule, the third *Minnesota Voters Alliance* requirement is also satisfied.

In sum, Sierra Club satisfies the *Minnesota Voters Alliance* requirements because the alleged economic harm to Sierra Club's members is (1) "different in nature from that of the citizenry in general" despite being common; (2) not speculative or hypothetical; and (3) specific to the 2010 order. We conclude that Sierra Club has standing to seek declaratory relief under section 14.44.

## II.     The order exceeded the PUC's authority.

Sierra Club argues that the PUC has neither express nor implied authority to regulate nonpublic utility ARCs. We agree.

"The PUC is a state agency of statutory origin." *Senior Citizens Coal. of Ne. Minn. v. Minn. Pub. Utils. Comm'n*, 355 N.W.2d 295, 302 (Minn. 1984). As such, the PUC has

only the powers conferred to it by the legislature. *Id.* The legislature has expressly granted the PUC the authority to regulate public utilities. Minn. Stat. § 216B.08 (2024) ("The [PUC] is hereby vested with the powers, rights, functions, and jurisdiction to regulate . . . every public utility as defined herein."); *see also* Minn. Stat. § 216B.02, subd. 4 (2024) (defining a "[p]ublic utility" as an entity "operating, maintaining, or controlling in this state equipment or facilities for furnishing at retail natural, manufactured, or mixed gas or electric service to or for the public or engaged in the production and retail sale thereof").

The parties agree that ARCs are not public utilities. The precise question before this court is, therefore, whether the PUC has the authority to regulate ARCs as it purported to do in the 2010 order.[3]

"Whether an administrative agency has acted within its statutory authority is a question of law that we review de novo." *In re Hubbard*, 778 N.W.2d 313, 318 (Minn. 2010). Our review of this legal question does not require us to defer to "agency expertise." *Frost-Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn. 1984); *see also In re N. States Power Co.*, 775 N.W.2d 652, 656 (Minn. App. 2009). Instead, "[w]e look to the plain language of the authorizing statute to determine what an agency's powers include." *Hibbing Taconite Co. v. Minn. Dep't of Nat. Res.*, 17 N.W.3d 160, 164

---

[3] This question was raised to the PUC in 2022 when it issued a second notice of comment period, asking, in part, whether ARCs should be permitted to bid demand response in organized markets. In response, the PUC received comments questioning whether it had the authority to issue the original order. Rather than addressing the issue, the PUC voted to "table" consideration of the issue, which it has not since revived.

(Minn. App. 2025). "An agency's authority may be stated either expressly in statute or implied from the express powers given to the [agency] by the Legislature." *Id.* (alteration in original) (quotation omitted). "We resolve any doubt about the existence of an agency's authority against the exercise of such authority." *In re App. of Minn. Power for Auth. to Increase Rates for Elec. Serv.*, 838 N.W.2d 747, 753 (Minn. 2013) (quotation omitted).

A.     **The PUC lacks express authority to regulate ARCs.**

"An agency has express authority to act only when a statute unambiguously grants the agency such authority." *Hibbing Taconite Co.*, 17 N.W.3d at 164. "To determine whether an agency has express authority, we analyze whether the relevant statute unambiguously grants authority for an administrative agency to act in the manner at issue." *Id.* (quotation omitted).

The PUC argues that it has express authority to issue the order under Minnesota Statutes section 216A.05, subdivision 6(1) (2024). We disagree. That provision empowers the PUC "to cooperate with all federal agencies for the purpose of harmonizing state and federal regulations within the state to the extent and in the manner deemed advisable." Minn. Stat. § 216A.05, subd. 6(1). But the plain language of the statute does not unambiguously grant the PUC authority to regulate non-utility entities like ARCs. *Id.*

The PUC insists that the 2009 FERC rule required the PUC to decide whether to allow ARCs to participate in demand response. *See* 18 C.F.R. § 35.28(g)(1)(iii). As such, the PUC insists that the directive from FERC required the PUC to harmonize state and federal regulations in Minnesota under section 216A.05, subdivision 6(1).

9

Putting aside that section 216A.05 provides no express authority for the PUC to regulate ARCs, the 2009 FERC rule did not require any harmonization with state law. Before the FERC rule, Minnesota law was silent as to whether ARCs could participate in the demand response market. The PUC did not need to take any action to implement the new FERC rule. Nothing in the state and federal regulations needed harmonizing.

The FERC rule allowed state agencies, like the PUC, to opt out of allowing ARCs to participate in the response-demand market. *Id.* But that opt-out provision did not purport to confer express power to the PUC to regulate ARCs.[4] Thus, we conclude that the PUC had no express authority to issue the 2010 order because the order purports to regulate ARCs.

## B. The PUC lacked implied authority to regulate ARCs.

The PUC alternatively argues that it has implied authority to regulate nonpublic utility ARCs as it did in the order. "[A]ny enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature." *Hibbing Taconite Co.*, 17 N.W.3d at 164 (quotation omitted). The Minnesota Supreme Court has cautioned that courts should be "reluctant to find implied statutory authority." *Id.* (quotation omitted). "In analyzing whether the legislature [has] granted [an agency] implied authority," we "construe the statutory language consistent with the legislature's intent and in a sensible manner that avoids unreasonable, unjust, or absurd results." *Id.* at 168 (quotation omitted).

---

[4] We question whether a state agency can be conferred authority from a federal agency. But we need not resolve that question in this case.

10

The PUC again cites section 216A.05, subdivision 6(1), this time as the basis for its implied authority. The PUC asserts that this statute, combined with the 2009 FERC regulation, grants the PUC the implied authority to issue an order prohibiting nonpublic utility ARCs from participating in the demand-response market. But a different subdivision of that same statutory section reveals that the PUC's authority cannot be so broadly construed. Section 216A, subdivision 1 provides:

> The functions of the [PUC] shall be legislative and quasi-judicial in nature. It may make such investigations and determinations, hold such hearings, prescribe such rules, and *issue such orders with respect to the control and conduct of the businesses coming within its jurisdiction* as the legislature itself might make but only as it shall from time to time authorize. It may adjudicate all proceedings brought before it in which the violation of any law or rule administered by the Department of Commerce is alleged.

Minn. Stat. § 216A.05, subd. 1 (2024) (emphasis added). Section 216A.05, subdivision 1, authorizes the PUC to regulate the conduct only of those businesses that come within the PUC's jurisdiction. *Id.* The PUC has not cited any other statute—and we have not found one—that confers power to the PUC to regulate nonpublic utility entities like ARCs. Instead, the legislature has granted the PUC jurisdiction over public utilities, municipal utilities, and cooperative electric associations. Minn. Stat. § 216B.01 (2024) ("It is hereby declared to be in the public interest that public utilities be regulated as hereinafter provided[.]"); Minn. Stat. § 216B.08 ("The [PUC] is hereby vested with the powers, rights, functions, and jurisdiction to regulate . . . every public utility as defined herein."); Minn.

11

Stat. § 216B.17, subds. 6, 6a (2024) (granting the PUC authority to hear complaints against municipal utilities and cooperative electric associations).[5]

The PUC concedes, as it must, that ARCs are not utilities. Thus, ARCs do not fall within the PUC's jurisdiction over public utilities, cooperative utilities, or municipal utilities. The PUC has no implied authority to regulate ARCs as a nonpublic utility entities. Given the supreme court's precedent, we decline to enlarge the PUC's express powers by implication. *Hibbing Taconite Co.*, 17 N.W.3d at 164. From the "objectives and powers expressly given" by the legislature, it is not "fairly drawn and fairly evident" that the PUC has implicit authority over a nonpublic utility business or customers who may wish to use—or start—such a business. *Id.* Any such jurisdiction over nonpublic utility businesses must be found within the statutory grant of authority to the PUC.[6] Since that authority does

---

[5] In limited circumstances that are not applicable here, the PUC also has jurisdiction over certain landlords. *See* Minn. Stat. § 216B.022, subd. 2(a) (2024) ("A landlord of a shared-metered residential building with installed submeters is subject to the [PUC's] authority[.]").

[6] The PUC may, of course, ask the legislature to confer authority to it for the purposes of responding to the 2009 FERC rule. Arkansas did exactly that. The Arkansas Legislature expressly conferred authority to their agency to regulate ARCs. Ark. Code. Ann. § 23-18-1003 (West 2025) (providing that ARCs are "subject to regulation by . . . [t]he Arkansas Public Service Commission"). The Arkansas Legislature has also prohibited the use of ARCs by public utility retail customers unless the regulatory commission determined that ARCs are beneficial to the public. Ark. Code Ann. § 23-18-1004 (West 2025) ("The marketing . . . and selling of demand response into wholesale electricity markets by an [ARC] . . . is prohibited unless the Arkansas Public Service Commission . . . determines that [it] is in the public interest."). By contrast, Minnesota's PUC issued its order without first seeking legislative authorization to regulate ARCs.

not exist in this case, we conclude that the PUC exceeded its authority in issuing the order that prohibited ARCs conduct.[7]

**Rule declared invalid.**

---

[7] Because we resolve this appeal based on the PUC's lack of authority, we need not address whether the PUC should have proceeded by issuing an order (like it did) or through rulemaking. Without jurisdiction over the ARCs, either process seeking to regulate ARCs conduct would be invalid.