(No. 53874

COMMONWEALTH EDISON COMPANY, Appellee, v. THE DEPARTMENT OF LOCAL GOVERNMENT AFFAIRS *et al.,* Appellants.

*Opinion filed May 22, 1981.—Rehearing denied October 19, 1981.*

496

Tyrone C. Fahner, Attorney General, of Springfield (Karen Konieczny, of Chicago, of counsel), for appellant Department of Local Government Affairs.

Richard G. Ferguson, Lawrence D. Lasky, Paul F. Hanzlik, and William P. Suriano, of Isham, Lincoln & Beale, of Chicago, for appellee.

Frederic S. Lane and Ralph E. Loomis, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for *amici curiae* Zion Park District *et al.*

Fred L. Foreman, State's Attorney, of Waukegan, for *amicus curiae* County of Lake.

MR. JUSTICE MORAN delivered the opinion of the court:

The plaintiff, Commonwealth Edison Company (Edison), filed a complaint for administrative review in the circuit court of Cook County on November 28, 1978. Edison sought to reverse the assessment for tax purposes of 12 pollution-control facilities located in Cook County, which service Edison's electrical-generating stations. The assessment was made by the defendant Department of Local Government Affairs (Department). The circuit court affirmed the assessment and held that the pollution-control facilities were properly assessed under sections 21a—1 and 21a—3 of the Revenue Act of 1939 (Act) (Ill. Rev. Stat. 1977, ch. 120, pars. 502a—1, 502a—3). The court reasoned that to the extent that pollution-control facilities are included in Edison's rate base from which its rates are determined they are economically productive to their owners. The appellate court reversed and held that the Department's assessment was contrary to the Act, which allows the taxation of pollution-control facilities only to the extent that the facility produces a product or service. (86 Ill. App. 3d 768.) We allowed the Department's petition for leave to appeal.

The sole issue is the proper method of assessing Edison's pollution-control facilities under the Act. The Department does not dispute Edison's assertion that the pollution-control facilities in question do not produce a product or service or reduce Edison's cost of production in any manner.

In 1977, Edison filed annual tax returns with the Department. The return form, provided by the Department, requested information concerning each facility's original cost, present fair cash value, and salvage value. The form also asked the following question: "Does the control facility have any enhancement to the manufactured product or is there a by-product derived from the control facility?" Edison responded "No" to this question for each facility. The Department, under the authority of section 21a—1 of the Act, assessed each facility on the basis of the information furnished on the return at 33 1/3% of its present cash value. This section provides:

> "Statement of policy. It is hereby declared to be the policy of the State of Illinois that pollution control facilities should be valued, for purposes of the real and personal property tax laws of this State, in relation to 33 1/3% of the fair cash value of their economic productivity to their owners." (Ill. Rev. Stat. 1977, ch. 120, par. 502a—1.)

Section 21a—3 enumerates guidelines by which the Department may assess pollution control facilities.

> "Method of valuation for pollution control facilities. For the purpose of determining 33 1/3% of the fair cash value of any certified pollution control facilities in assessing said facilities under the real and personal property tax laws of this State, the Department shall take into consideration the actual or probable net earnings attributable to the facilities in question, capitalized on the basis of their productive earning value to their owner; the probable net value which could be realized by their owner if the facilities were removed and sold at a fair, voluntary sale, giving due account to the expense of removal and condition of the particular facilities in question; and such other information

as the Department may consider as bearing on 33 1/3% of the fair cash value, to their owner, of the pollution control facilities in question, consistent with the principles set forth herein." Ill. Rev. Stat. 1977, ch. 120, par. 502a—3.

Edison protested the 1977 assessments and requested a review and correction, claiming that the Department's assessment violated sections 21a—1 and 21a—3 of the Act. It asserted that under the Act assessments were to be based on "economic productivity," taking into account the "productive earning value" of the facilities. In that the facilities produced nothing, Edison claimed that the assessments based on present cash value were erroneous. It further claimed that it was denied equal protection of law in that its pollution-control facilities are assessed by a different method than pollution-control facilities of non-regulated industry.

A hearing was held before the Department on February 8, 1978. The transcript of a hearing concerning the Department's 1977 assessment of Edison's Lake County pollution-control facilities was made part of the record on appeal. Dr. John L. Langum, an economic consultant, testified on behalf of Edison. He stated that " 'economic productivity' of property can only mean the contribution by that property to the goods or services produced by that property and sold to customers." He also stated, "Pollution-control facilities of an electric utility have no 'economic productivity' because they make no contribution to the kilowatt hours of electricity produced and sold by the utility."

Dr. Langum also explained that Edison's rates are regulated by the Illinois Commerce Commission to allow Edison to recover all of its operating expenses and to earn a fair rate of return on all of its invested capital. Ralph Olson, auditor for the Illinois Commerce Commission, testified that the total cost of all of Edison's pollution-control facilities is included in its rate base on an equal

basis with the cost of all other invested capital. That rate base is then used as the foundation for the computation of a fair rate of return on invested capital.

Ron Deloney, an assessor, testified on behalf of the Department. He explained that the Department may utilize either one of two approaches: (1) a cost approach by which the Department assesses the facilities at 33 1/3% of their net salvage value or (2) an income approach by which the facilities are assessed at 33 1/3% of the present fair cash value. He stated that pollution-control facilities of nonregulated industries are normally assessed utilizing the cost approach. Deloney further stated that the income approach is used in assessing pollution-control facilities of utilities since the facilities are included in the base from which rates are determined.

The Department issued its administrative decision on October 27, 1978, and confirmed the assessment. The hearing officer found that utilities "are unique in that they are a monopoly and do receive through rate increases, additional revenues for the investment. *** The facility produces an extra price increment on the electricity sold." The hearing officer properly characterized pollution-control facilities as one element includable in the utility's rate base for rate-making purposes. The rate base and rate of return, as determined by the Illinois Commerce Commission, are the components used to develop a reasonable return to compensate investors for their capital investments.

This court in *Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1953), 414 Ill. 275, 286, stated:

> "In the final analysis, the rates fixed by [the Commission] *** should be sufficient to provide for the operating expenses, depreciation, reserves that are necessary in good business judgment and operations and a reasonable return to the investor on the basis of the fair value of the utility property."

Thus, the return to utility investors on their investment in these types of facilities is clearly includable in the rates which the utility may charge, thereby increasing the price of the product sold and the revenues which the utility may receive.

The correctness of the assessment of Edison's pollution-control facilities is dependent upon the interpretation accorded the terms "economic productivity" and "productive earning value" as employed by sections 21a—1 and 21a—3 of the Act (Ill. Rev. Stat. 1977, ch. 120, pars. 502a—1, 502a—3). The Department urges that the terms be accorded a broad meaning. It argues that section 21a—3 does not outline an all-inclusive formula to be utilized by the Department in assessing pollution-control facilities. Rather, the statute lists some factors which may be considered but grants broad discretion to the Department by allowing it to consider "such other information as the Department may consider as bearing on the 33-1/3% of the fair cash value *** consistent with the principles set forth herein." Thus, the Department interprets the phrases "economic productivity" and "productive earning value" to mean the facilities are productive of income. The Department concludes that Edison's pollution-control facilities produce income by their inclusion in the rate base upon which the rate of return is computed.

Edison's position is that the terms "economic productivity" and "productive earning value" refer only to the extent to which pollution-control facilities actually contribute to production of a product. Edison, in its brief, asserts, "Only when they increase the quantity of goods or services sold by their owner, reduce production costs or enhance production, are they to be assessed as productive equipment."

After the circuit court rendered its judgment and prior to the decision of the appellate court, section 21a—3 was amended. The amendment became effective January

1, 1980. (Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.) The Department concedes that "this amendment codifies the position taken by Edison throughout the litigation." The amendment restates the language of the former statute in total and adds the following:

> "For the purposes of this Act, earnings shall be attributed to a pollution control facility only to the extent that the operation thereof results in the production of a commercially saleable by-product or increases the production or reduces the production costs of the products or services otherwise sold by the owner of such facility. ***
>
> This amendatory Act of 1979 is not intended to nor does it make any change in the meaning of any provision in this Section but is intended to remove possible ambiguities, thereby confirming the existing meaning of this Section in effect prior to the effective date of this amendatory Act of 1979." (Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.)

The Department argues that this amendment cannot be used to determine the meaning of the disputed terms, for to do so would allow the General Assembly to retroactively alter the meaning of previously enacted statutory language. Edison, on the other hand, argues that the amendment makes no substantive change in the meaning of the 1977 statute. It claims that the amendment merely clarifies the legislative intent of the previously ambiguous terms.

In support of its argument, the Department relies on *Roth v. Yackley* (1979), 77 Ill. 2d 423. In *Roth,* the sole issue was the effect to be given to an amendatory act of the General Assembly. The basis of the action brought in *Roth* was this court's decision in *People v. DuMontelle* (1978), 71 Ill. 2d 157. *DuMontelle* held that fines and costs were not "reasonable terms and conditions" of probation as that term was used in section 10 of the Cannabis Control Act. In so holding, the court specifically found that "the clear import of the statutory language" was that an order of probation was not a "conviction" as

that term is used in the Unified Code, and that therefore fines and costs could not be imposed by statute. (71 Ill. 2d 157, 163.) Three months after the *DuMontelle* decision was rendered, the General Assembly enacted amendments to section 10 of the Cannabis Control Act and to section 410 of the Illinois Controlled Substances Act. The amendments expressly authorized the imposition of fines and costs as conditions of probation and further provided:

> "The General Assembly declares that the changes made by this amendatory Act *** are declaratory of existing law and are therefore applicable in relation to events which occurred before the effective date of this amendatory Act. The 'terms and conditions' of probation as specified in this amendatory Act are declared to be reasonable terms and conditions for probation under the affected Sections as those Sections were in effect before the effective date of this amendatory Act." (Pub. Act 80–1202, sec. 3, eff. June 30, 1978, Ill. Rev. Stat. 1979, ch. 56½, par. 1410.)

In discussing the application of this amendment, the court in *Roth* held that "although the General Assembly asserted that the changes made by the amendatory act were merely a declaration of existing law, it is manifest that the amendatory act changed the statutory language and prior law as determined by this court in *DuMontelle* from the clear import of the original statutory language." (*Roth v. Yackley* (1979), 77 Ill. 2d 423, 428.) Therefore, the court in *Roth* determined that the amendment could not be used to alter the previously clear statutory language as interpreted by this court in *DuMontelle.*

We find that the recent opinion of this court in *O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, is analogous to the question here posed. In *O'Connor,* over 500 owners of real estate paid their taxes under protest and filed objections to "the multiplier" used for the assessment of farm property. The objectors relied on section 20e of the Act, which became effective in 1977.

(Ill. Rev. Stat. 1977, ch. 120, par. 501e.) The section established a new procedure for establishing valuation for assessment purposes on farmland, farm buildings, and farm dwellings. The section (Ill. Rev. Stat. 1977, ch. 120, par. 501e), similar to the statutory language of the case before us, provided that farmland of lesser value than that classified as the highest or best grade within the county shall be valued for assessment purposes by local assessment officials on the basis of its productivity. (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 265-66.) One of the issues raised by the county collector was that the section was invalid. The challenged portion provided:

> "Any owner of a 'farm', as defined in Section 1 of this Act, *** shall be eligible for a farm value assessment on such farm real property pursuant to this Section." (Ill. Rev. Stat. 1977, ch. 120, par. 501e.)

The county collector argued that "the section does not provide for an automatic application of farm-value assessment and that there is no direction to the collector as to when and under what circumstances a farm value assessment is to be applied." This court resorted to a subsequent amendment (Pub. Act 81–774, effective January 1, 1980, Ill. Rev. Stat. 1979, ch. 120, par. 501e.) In doing so, the court found that section 20e was intended by the legislature to apply automatically, thereby resolving the ambiguity raised by the collector. The court stated:

> "In 1979 the General Assembly adopted Public Act 81–774, which amended section 20e, changing the language questioned by the collector. The words 'any owner' and 'eligible for farm value assessment on such farm real property' have been deleted. The section now reads, 'The equalized assessed value of a "farm" *** shall be determined pursuant to this Section.' (Ill. Rev. Stat. 1979, ch. 120, par. 501e.) There is now no question but that the assessment procedures of section 20e apply

automatically." *O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 271.

The court in *O'Connor* found that although the passage of an amendment raises a presumption that the legislature intended to change the substantive law, the presumption will be rebutted if the circumstances show that the legislative intent was to clarify previously ambiguous language. (See *Bruni v. Department of Registration & Education* (1974), 59 Ill. 2d 6, 11-12; *People v. Bratcher* (1976), 63 Ill. 2d 534, 543; *People v. Scott* (1974), 57 Ill. 2d 353, 358; *Creel v. Industrial Com.* (1973), 54 Ill. 2d 580, 584; *People ex rel. Spitzer v. County of La Salle* (1960), 20 Ill. 2d 18, 28.) The court found that "the purpose of the amendment was to clarify the ambiguity which the collector contended existed as to whether or not the assessment procedures applied automatically to farm real estate." (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 272.) To determine the intent of section 20e, the court resorted to the amendment in interpreting the previously ambiguous language.

The holding of *Roth* is not contrary to the law as enunciated in *O'Connor* and the related cases cited above. In *Roth,* the statutory language in question had been interpreted by this court in *DuMontelle,* and that interpretation became law. At the time the amendatory act became law, the statute had been rendered unambiguous by this court's pronouncement, and, consequently, the subsequent amendment was necessarily an attempt to change the law and not merely a device to clarify existing ambiguity.

We do not believe that *Roth* is analogous to the present case. Here, the terms "economic productivity" and "productive earning value" of the 1977 statute are ambiguous. It is impossible to ascertain from the language of the Act if pollution-control facilities which do not "produce" goods or services but which are part of a

utility's rate base for purposes of rate regulation are considered "economically productive" and thus subject to assessment at their present fair cash value. Therefore, the presumption that the General Assembly intended to change the law by passage of the 1979 amendment does not arise. Moreover, no change in the language of the 1977 statute was made. Rather, the amendment expressly clarified the previously ambiguous terms by stating that earnings are attributable to a pollution-control facility only to the extent that the operation of the facility "results in the production of a commercially saleable by-product or increases the production or reduces the production costs of the products or services otherwise sold by the owner of such facility." (Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.) Further, the amendment itself states that the intent of its passage was "to remove possible ambiguities, thereby confirming the existing meaning" of the statute prior to the amendment's enactment. (Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.) Unlike *Roth,* sections 21a—1 and 21a—3 of the Act had not been interpreted by this court to resolve the ambiguity.

We therefore hold that the amendment to section 21a—3, effective January 1, 1980, may be used to interpret the phrases "economic productivity" and "productive earning value" as used in sections 21a—1 and 21a—3 of the 1977 act. Having reached this conclusion, it necessarily follows, as the Department concedes, that the 1977 assessments of Edison's 12 pollution-control facilities did not comply with sections 21a—1 and 21a—3 of the Act (Ill. Rev. Stat. 1977, ch. 120, pars. 502a—1, 502a—3). In reaching this result, we find it unnecessary to address the constitutional issue raised by Edison.

For the reasons stated, we affirm the judgment of the appellate court.

*Judgment affirmed.*