CHICAGO SMSA LIMITED PARTNERSHIP *et al.*, Plaintiffs-Appellants, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (4th Division)   Nos. 1—98—3565, 1—99—1114 cons.

Opinion filed July 29, 1999.—Rehearing denied August 26, 1999.

Brian L. Wolfberg and Katriina S. McGuire, both of Schain, Firsel & Burney, Ltd., and Alex R. Seith, of Morrill & Associates, both of Chicago, for appellants.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for appellees.

JUSTICE WOLFSON delivered the opinion of the court:

The taxpayers in this case are cellular telephone service providers. They pose a $1.4 million question: do the words "exclude from active regulatory oversight" in one statute have the same meaning as "not regulated" in another? If they do, the taxpayers do not have to pay the invested capital tax assessed by the Illinois Department of Revenue.

We conclude the phrases in the two statutes were not intended to mean the same thing. For that and other reasons, we affirm the trial court's orders requiring the taxpayers to pay the Department of Revenue's assessments.

FACTS

Chicago SMSA Limited Partnership, Cybertel Cellular Telephone Company, Illinois RSA 6 & 7, and Illinois SMSA Limited Partnership (collectively, taxpayers) are federally licensed cellular telephone service providers. Cellular telephones use radio waves to receive and transmit messages across small "switching sites" scattered throughout the service area. The cellular industry began modestly in the 1980s with 100,000 nationwide customers by 1984, but exploded in the 1990s with approximately 16 million nationwide customers by 1994. Unlike the traditional land-based telephone service industry, the cellular industry is marked by robust competition among providers.

In 1985, the Illinois General Assembly recognized this competition and responded by prohibiting the Illinois Commerce Commission (ICC) from restricting market entry of federally licensed cellular providers, and empowered the ICC to exclude such providers from "active regulatory oversight." 220 ILCS 5/13—203 (West 1996).

On February 18, 1987, the ICC entered an order on Chicago SMSA Limited Partnership's "Petition for rulemaking with respect to exclusion of cellular radio service from active regulatory oversight." See *In re Chicago SMSA Ltd. Partnership*, 81 Pub. Util. Rep. 4th 287 (1987). The ICC concluded the cellular industry in Chicago should be removed from active regulatory oversight. 81 Pub. Util. Rep. 4th at 309. The ICC later extended this order to the entire cellular industry. See 83 Ill. Adm. Code § 760.10 (1996) ("For purposes of the exclusion from active regulatory oversight for providers of cellular radio service *** cellular radio service *** is excluded from the applicable tariff provisions ***").

In 1991, the General Assembly amended the Messages Tax Act to exempt persons "not regulated" by the ICC from the invested capital tax. See 35 ILCS 610/2a.1 (West 1996).

In 1992, taxpayers received notices of invested capital tax liability from the Illinois Department of Revenue (the Department). Taxpayers waived an evidentiary hearing before an administrative law judge, and, instead, taxpayers and the Department submitted a stipulation of facts. The parties stipulated, *inter alia:*

"(4) During the applicable period of assessment, at issue herein and up to the date of this stipulation, taxpayers are excluded from applicable tariff provisions contained in Article XIII of the Public Utilities Act. (See Docket 85—0477: Commission Order issued February 18, 1987).

(5) During the applicable period of assessment, at issue herein and up to the date of this stipulation, taxpayers are removed from active regulatory oversight (the most active regulatory oversight

being the filing of tariffs), however, taxpayers remain subject to all other applicable provisions of the Public Utilities Act. (Finding number (7) See Docket 85—0477: Commission Order issued February 18, 1987).

\* \* \*

(7) Department's position on [t]axpayers' being subject to regulation of the Illinois Commerce Commission is partially based upon [t]axpayers' being subject to payment of Public Utility Tax."

The administrative law judge made his recommendation on October 13, 1995. The judge found the ICC rejected taxpayers' 1987 request to deregulate completely cellular telephone service in this area. The judge said the ICC may have removed tariff oversight, but he noted the ICC also ordered, "There are no other provisions [of the Public Utilities Act] from which cellular radio service should be exempted." 81 Pub. Util. Rep. 4th at 307. The judge concluded:

"Since the [ICC], which is the interpreter of the provisions of the Public Utilities Act, deems that it retains regulatory authority over cellular radio service pursuant to its enabling legislation, and the legislature has not intervened to remove that regulatory aspect which was laid down in 1987, the legislature would be presumed to understand that decision of the Commission when it amended [the Messages Tax Act in 1991]."

The Department issued its final assessments on November 3, 1995, concluding taxpayers owed $1,385,416.70 in invested capital tax.

Taxpayers filed a complaint for administrative review. On August 31, 1998, the trial court entered its "MEMORANDUM DECISION AND JUDGMENT." On September 16, 1998, the court withdrew this order and entered a second "MEMORANDUM DECISION AND JUDGMENT." The court affirmed the Department's conclusion.

On September 22, 1998, taxpayers filed a notice of appeal from the trial court's August 31 order "as revised September 10, 1998," attaching the September 16 order. On March 24, 1999, taxpayers filed a second notice of appeal from the trial court's February 25, 1999, judgment order "incorporating the trial court's Memorandum Decision and Order entered on September 10, 1998." These two appeals have been consolidated before us.

### DECISION

■ Taxpayers offer several reasons why the trial court erred in affirming the Department's assessment of invested capital tax under the Messages Tax Act (35 ILCS 610/1 *et seq.* (West 1996)). These reasons all involve issues of statutory construction, and our standard of review is *de novo. Thomas M. Madden & Co. v. Department of Revenue,* 272

Ill. App. 3d 212, 215, 651 N.E.2d 218 (1995). We turn to taxpayers' contentions.

■ First, taxpayers contend the Illinois General Assembly never intended the Messages Tax Act's invested capital tax to apply to the cellular industry because the invested capital tax was enacted and first imposed in 1979, before the cellular telephone boom. Taxpayers contend the General Assembly intended to impose the invested capital tax only on monopolistic public utilities. This argument, however, finds no support in the language of the statute, and we decline to add a monopoly limitation on the invested capital tax. See *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656 (1990). The legislature did not have to anticipate every variety of public utility that might be created. The descriptive phrase is generic and of sufficient breadth to cover cellular providers.

■ Second, taxpayers contend the invested capital tax did not apply to the cellular industry during the years they were assessed because the ICC removed the cellular industry from active regulatory oversight. This contention is presented as an alternative to the taxpayers' first claim that they never were intended to be covered by the 1979 statute. For this contention, they assume the tax did apply to them until the enactment of the 1991 amendment to the Messages Tax Act.

In 1986, the General Assembly amended section 13—203 of the Universal Telephone Service Protection Law of 1985, part of the larger Public Utilities Act (220 ILCS 5/13—203 (West 1996)). Section 13—203 provides:

> "The Commission may, by rulemaking, exclude *** cellular radio service *** from *active regulatory oversight to the extent it finds *** that such exclusion is consistent with the public interest and the purposes and policies of this Article.*" (Emphasis added.) 220 ILCS 5/13—203 (West 1996).

Earlier, in 1979, the General Assembly had added section 2a.1 to the Messages Tax Act, imposing a tax on invested capital. In 1991, the General Assembly amended section 2a.1: "The invested capital tax imposed by this Section shall not be imposed upon persons who are *not regulated* by the Illinois Commerce Commission ***." (Emphasis added.) 35 ILCS 610/2a.1 (West 1996).

The trial court framed the issue: "The legal question is whether the legislature contemplated some category or area between 'active regulatory oversight' and total unregulation." In other words, do those two phrases mean the same thing or do they mean something different?

The ICC, the agency with expertise in interpreting the Public

Utilities Act (see *Thomas M. Madden*, 272 Ill. App. 3d at 215), has never equated removing active regulatory oversight with removing all regulation.

In fact, in 1987 the ICC expressly reserved authority to regulate. It never was authorized by the legislature to abandon all cellular telephone service regulation. In its 1987 order on taxpayers' petition for rulemaking, the ICC said:

"Section 13—203 authorizes this Commission to remove cellular radio service 'from active regulatory oversight.' *That language suggests this Commission should maintain some level of regulatory oversight over cellular radio service.* Section 13—203 further provides that removal from oversight should be 'to the extent it finds *** such exclusion is consistent with the public interest and the purposes and policies of this Article.' The Commission interprets this language as requiring an analysis of the provisions of the Act that apply to cellular radio service and deciding which provisions need not be complied with under the standard set forth in section 13—203. Support for this interpretation is found in the language of Section 13—103(b), *** which provides that 'competition should be permitted to function as a substitute for certain aspects of regulation ***.' *The General Assembly did not direct that competition be allowed to substitute for regulation, only for certain aspects of regulation.*" (Emphasis added.) 81 Pub. Util. Rep. 4th at 305-06.

In suggesting the removal of cellular telephone service from active regulatory oversight, the ICC found:

"*[T]he most active regulatory oversight* this Commission maintains over telecommunications carriers providing competitive services arises from the requirements in Article XIII of the Act governing the filing of tariffs; the providers of cellular radio service should be excused from the requirements of Article XIII pertaining to filing and maintenance of tariffs with this Commission; *all other provisions of the Act remain applicable to providers of cellular radio service in the Chicago SMSA ***.*" (Emphasis added.) 81 Pub. Util. Rep. 4th at 309.

Similarly, the General Assembly has never equated removal of active regulatory oversight with removing all regulation. The Public Utilities Act authorizes the ICC to remove active regulatory oversight of the cellular industry "*to the extent [that]* *** such exclusion is consistent with the public interest.*" (Emphasis added.) 220 ILCS 5/13—203 (West 1996). The legislature, therefore, anticipated the ICC would remove some regulation, but maintain other regulatory options over cellular providers.

Article IV, "General Powers and Duties of Commission," governs

the ICC and its members. Section 4—101 gives the ICC "general supervision of all public utilities, except as otherwise provided in this Act." 220 ILCS 5/4—101 (West 1996). The ICC has used this supervisory authority to require number pooling by cellular providers. See Citizens Utility Board: Petition to Implement a form of telephone number conservation known as number pooling. *Citizens Utility Board*, Ill. Com. Comm'n, Nos. 97—0192, 97—0211 (May 11, 1998).

Article V, "Duties of Public Utilities Accounts and Reports," regulates public utilities, including cellular providers. The provisions in article V require public utilities to keep accounts "showing all sources of incomes, the amounts due and received from each source and the amounts expended and due for each purpose, distinguishing clearly all payments for operating expenses from those for new construction, extensions and additions and for balance sheets showing assets and liabilities and various forms of proprietary interest." 220 ILCS 5/5—103 (West 1998). The ICC has the authority to require public utilities to keep depreciation accounts. The ICC can audit public utility accounts, and the statute includes civil and criminal penalties for falsifying or failing to keep accounts.

Additionally, the Telecommunications Act of 1996 (47 U.S.C. § 252 (Supp. 1996)) requires state commissions like the ICC to approve interconnection agreements between telecommunications providers. See *Alton Celltel Cellular Corp.*, Ill. Com. Comm'n, No. 98 NA—006 (May 6, 1998); *Southwestern Bell Mobile Systems, Inc.*, Ill. Com. Comm'n, No. 97 NA—006 (May 7, 1997).

This regulation, perhaps best characterized as passive or residual, still amounts to regulation. Taxpayers' "plain meaning" argument does not change that fact.

Taxpayers assert, "Based on the plain meaning of the term, to regulate means to take some active role in governing or directing activity." But, according to taxpayers, Webster's Dictionary defines "regulate" as "govern or direct according to rule." Webster's Collegiate Dictionary 985 (10th ed. 1993). The ICC's passive or residual regulation surely governs or directs the cellular industry.

We presume the General Assembly recognized the difference between no active regulatory oversight and no regulation at all. "Different results are presumed to be intended when the legislature uses certain words in one instance and different words in another." *Yiadom v. Kiley*, 204 Ill. App. 3d 418, 430, 562 N.E.2d 310 (1990); see *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 237, 664 N.E.2d 61 (1996) ("The most reliable indicator of legislative intent is the language of the statute"). If the legislature in 1991 intended to say the tax did not apply to cellular providers over which the ICC conducted "no active regulatory oversight," it could have said so.

Taxpayers contend the Department conceded its arguments partially rest on the application of the Public Utilities Act to the cellular industry. Taxpayers claim *Chicago SMSA Ltd. Partnership v. Illinois Commerce Comm'n*, 284 Ill. App. 3d 326, 672 N.E.2d 37 (1996), held the Public Utilities Act did not apply to cellular providers. Taxpayers read too much into this case. The *Chicago SMSA* court noted the Act imposed a tax on "gross revenue," which included revenue raised under regulated rates. *Chicago SMSA*, 284 Ill. App. 3d at 329. The court held cellular providers bore no tax liability under the Public Utilities Act because the ICC had excluded the cellular industry from rate regulation. *Chicago SMSA*, 284 Ill. App. 3d at 329. Nothing in the decision says the Public Utilities Act did not apply to cellular providers.

Rate and market entry regulation may be the "heart of regulation," but it is not the only regulation the ICC may apply. And because taxpayers were regulated by the ICC, the Department could assess the invested capital tax. In short, we hold section 2a.1 requires a complete surrender of regulation before the invested capital tax is excused.

■ Third, taxpayers contend the statement of legislative intent in the recently enacted Telecommunications Municipal Infrastructure Maintenance Fee Act (the Telecommunications Act) (35 ILCS 635/1 *et seq.* (West 1998)), which repealed the Messages Tax Act's invested capital tax, shows the General Assembly never intended to apply the invested capital tax to the cellular industry.

The Telecommunications Act's "legislative intent" section provides:

"The General Assembly imposed a tax on invested capital of utilities to partially replace the personal property tax that was abolished by the Illinois Constitution of 1970. Since that tax was imposed, telecommunications retailers have evolved from utility status into an increasingly competitive industry serving the public. This Act is intended to abolish the invested capital tax on telecommunications retailers ***. *Cellular Telecommunications retailers have already been excluded from application of the invested capital tax by earlier legislative action.*" (Emphasis added.) 35 ILCS 635/5 (West 1998).

Section 15 of the Telecommunications Act provides:

"(a) A State infrastructure maintenance fee is hereby imposed upon telecommunications retailers as a replacement for the personal property tax ***.

(b) The amount of the State infrastructure maintenance fee imposed upon a telecommunications retailer under this Section shall be equal to 0.5% of all gross charges charged by the telecommunications retailer to service addresses in this State for telecommunications, other than wireless [cellular] telecommunications, originating or received in this State." 35 ILCS 635/15 (West 1998).

According to taxpayers, the Telecommunications Act's infrastructure maintenance fee replaced the invested capital tax. The legislative debates support this interpretation of the Telecommunications Act. See 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 110 (statements of Senator O'Malley) (Telecommunications Act "would replace the outmoded State tax on invested capital with a uniform statewide infrastructure fee"); 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 67 (statements of Representative Kubik) (Telecommunications Act "would replace the out [*sic*] moded state tax on invested capital with a uniform statewide infrastructure fee").

This infrastructure maintenance fee does not apply to cellular providers. 35 ILCS 635/15(b) (West 1998). According to taxpayers, the General Assembly did not include cellular providers in 1997 because cellular providers already were excluded from the scope of the replaced invested capital tax by the 1991 statute, amended section 2a.1. Taxpayers claim the legislature recognized this exclusion in the "by earlier legislative action" language of the Telecommunications Act. 35 ILCS 635/15 (West 1998).

Taxpayers rely on *Commonwealth Edison Co. v. Department of Local Government Affairs*, 85 Ill. 2d 495, 426 N.E.2d 817 (1981), for the proposition that the outcome of this case is controlled by the statement of "legislative intent" in the Telecommunications Act. The taxpayers give *Commonwealth Edison* too extravagant a reading.

The issue in *Commonwealth Edison* was the meaning of the terms "economic productivity" and "productive earnings value" in a 1977 statute used to assess Edison's pollution control facilities. See Ill. Rev. Stat. 1977, ch. 120, pars. 502a—1, 502a—3. In a clarifying amendment two years later, the legislature said:

"This Amendatory Act of 1979 is not intended to nor does it make any change in the meaning of any provision in this Section but is intended to remove possible ambiguities, thereby confirming the existing meaning of the Section in effect prior to the effective date of this amendatory act of 1979." Ill. Rev. Stat. 1979, ch. 120, par. 502a—3.

The supreme court held that in the absence of any intervening judicial decision, the amendatory language should be taken at face value. *Commonwealth Edison*, 85 Ill. 2d at 505. That is, the 1979 act "expressly clarified the previously ambiguous terms." *Commonwealth Edison*, 85 Ill. 2d at 506. And "the amendment itself states that the intent of its passage was 'to remove possible ambiguities, thereby confirming the existing meaning' of the statute prior to the amendment's enactment." *Commonwealth Edison*, 85 Ill. 2d at 506.

We see no such legislative intent in this case. The statement in the

1998 statute does not purport to expressly clarify some existing ambiguity. In fact, it does not refer to any specific statute, underscoring the obvious fact that the Telecommunications Act does not bear the same section number as the Messages Tax Act. It is more of an historical statement, and, like many attempts to write history, it is incorrect.

We have found no similar "legislative intent" statement at issue in an Illinois decision. The United States Supreme Court has said: "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313, 4 L. Ed. 2d 334, 340, 80 S. Ct. 326, 332 (1960). That is, "It is the intent of the Congress that enacted [the section] *** that controls." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n.39, 52 L. Ed. 2d 396, 427 n.39, 97 S. Ct. 1843, 1864 n.39 (1977).

We see nothing ambiguous or uncertain about the 1991 statute. There was nothing to clarify or explain. Section 2a.1 excludes "persons *** not regulated by the Illinois Commerce Commission." 35 ILCS 610/2a.1 (West 1996). Taxpayers are regulated, to some extent, by the ICC. For that reason, we decline the invitation of both parties to delve into legislative debates leading to the enactment of the 1991 amendment to section 2a.1. As we have said:

> "[A] statute is not interpreted by its sponsor's comments when introducing legislation, nor is it interpreted by the statements of senators or representatives who voted to pass the legislation formulating the statute. Rather, a statute is interpreted by its language, which if certain and unambiguous, must be given effect as written." *People v. James*, 246 Ill. App. 3d 939, 948, 617 N.E.2d 115 (1993).

We note in passing that the legislative debates, should we consider them, do not support the taxpayers' position. Senator Cullerton and Representative Currie, the Senate and House sponsors of the 1991 amendment to section 2a.1, seemed to be saying the purpose of the amendment was to make it clear the invested capital tax does not apply to commercial office buildings. See 87th Ill. Gen. Assem., Senate Proceedings, June 19, 1991, at 12 (statements of Senator Cullerton); 87th Ill. Gen. Assem., Senate Proceedings, June 20, 1991, at 165-66 (statements of Senator Cullerton); 87th Ill. Gen. Assem., House Proceedings, June 27, 1991, at 114 (statements of Representative Currie).

■ Fourth, taxpayers contend the United States Congress has preempted state regulation of the cellular telephone services industry. But the statute on which taxpayers rely does not bear such a reading.

The Omnibus Budget Reconciliation Act of 1993 provides that "no

State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3) (1994).

This statute prohibits only market-entry and rate regulation and specifically allows other regulation. The ICC abandoned rate regulation in 1987. See 83 Ill. Adm. Code § 760.10 (1996). As taxpayers conceded in the stipulation, the ICC maintained other regulation under the Public Utilities Act. See 220 ILCS 5/13—101 (West 1996).

■ Fifth, taxpayers contend the invested capital tax is applied unequally between cellular providers and so-called resellers, in violation of the Illinois Constitution's uniformity clause.

The uniformity clause provides: "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly." Ill. Const. 1970, art. IX, § 2. "[C]lassifications for nonproperty taxes must be based on real and substantial differences between those taxed and those who are not and must also bear some reasonable relationship to the object of the legislation or public policy." *Communications & Cable of Chicago, Inc. v. City of Chicago*, 282 Ill. App. 3d 1038, 1049, 668 N.E.2d 1032 (1996), citing *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 512 N.E.2d 1240 (1987).

According to the parties' stipulation, resellers of cellular service purchase radio airtime wholesale from cellular providers like taxpayers and resell this airtime to cellular customers. Under the Public Utilities Act, resellers are not considered "telecommunications carriers" like taxpayers. See 220 ILCS 5/13—202 (West 1996).

Although cellular providers and resellers may engage in some competition, the General Assembly recognized substantial differences between these groups. Taxpayers concede "resellers do not supply the equipment that transmits any messages, as cellular service providers do." Unlike resellers, cellular providers must invest in transmitting equipment, exactly the capital the invested capital tax was meant to reach. We cannot say this classification was unreasonable.

■ Sixth, taxpayers contend they are exempt from the invested capital tax under the United States Constitution's commerce clause. See U.S. Const., art. I, § 8, cl. 3. Taxpayers contend they provide interstate cellular telephone service, but the record contains no evidence of the breadth of their coverage. The stipulation, the only evidence offered to the administrative law judge, does not mention interstate service.

"It is true that administrative agencies lack the authority to invalidate a statute on constitutional grounds or even to question its validity. [Citation.] Nonetheless, it is advisable to assert a constitutional challenge on the record before the administrative tribunal, because administrative review is confined to the proof offered before the agency. Such a practice serves the purpose of avoiding piecemeal litigation and, more importantly, allowing opposing parties a full opportunity to present evidence to refute the constitutional challenge." *Texaco-Cities Service Pipeline Co. v. Mc-Gaw*, 182 Ill. 2d 262, 278-79, 695 N.E.2d 481 (1998).

Taxpayers never raised the commerce clause issue before the Department. This issue has been waived. *Celotex Corp. v. Pollution Control Board*, 94 Ill. 2d 107, 120, 445 N.E.2d 752 (1983).

Even if we were to reach this issue, we would reject taxpayers' contention.

Taxpayers contend they bear no liability for invested capital tax because they bear no liability for the now-repealed messages tax under United States Supreme Court commerce clause authority which predates the original 1945 Messages Tax Act.

In 1979, the General Assembly amended the Messages Tax Act to impose an invested capital tax on persons subject to the messages tax. See Ill. Rev. Stat. 1979, ch. 120, par. 467.2a.1 (invested capital tax imposed on "persons engaged in the business of transmitting messages and subject to the tax imposed by [the Messages Tax] Act"). In 1982, the Illinois Supreme Court invalidated the messages tax as it applied to telephone companies engaged in interstate commerce. *Illinois Bell Telephone Co. v. Allphin*, 93 Ill. 2d 241, 443 N.E.2d 580 (1982); see *Answer Iowa, Inc. v. Department of Revenue*, 161 Ill. App. 3d 247, 514 N.E.2d 488 (1987). In 1991, the General Assembly amended the invested capital tax, removing its connection to the invalid messages tax. See 35 ILCS 610/2a.1 (West 1996) (invested capital tax imposed on "persons engaged in the business of transmitting messages and acting as a retailer of telecommunications"). This amendment removed any commerce clause impediment to imposing the invested capital tax. See *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977) (states may tax interstate commerce under limited conditions).

Besides, the invested capital tax is based on "invested capital," not the volume of taxpayers' interstate service. 35 ILCS 610/2a.1 (West 1996).

## CONCLUSION

Because the Department had statutory authority to assess the invested capital tax against taxpayers, we affirm the trial court's order

denying taxpayers' complaint for administrative review and its order in favor of the Department.

Affirmed.

SOUTH, P.J., and HOFFMAN, J., concur.