BILL KROHE, Plaintiff-Appellee, v. THE CITY OF BLOOMINGTON, Defendant-Appellant.

Fourth District No. 4—01—0229

Opinion filed May 13, 2002.

STEIGMANN, J., dissenting.

J. Todd Greenburg, Corporation Counsel, of Bloomington, for appellant.

William J. Connor, of Berg, Robeson & Connor, P.C., of Springfield, for appellee.

JUSTICE TURNER delivered the opinion of the court:

In June 2000, plaintiff, Bill Krohe, was awarded a line-of-duty disability pension by the City of Bloomington Pension Board (Board) based on injuries he sustained as a firefighter for defendant, the City of Bloomington (City). Thereafter, plaintiff requested that the City continue to pay the health insurance premiums for him and his family pursuant to section 10 of the Public Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2000)). The City denied the request, stating it was not required to pay the premiums.

In October 2000, plaintiff filed a complaint for declaratory judgment, requesting the trial court enter an order that plaintiff was entitled to have the premiums paid by the City pursuant to section 10 of the Act. In March 2001, the trial court, in construing section 10 of the Act, found the City was required to pay the health insurance premiums.

On appeal, the City argues the trial court erred in interpreting "catastrophic" injury under section 10 of the Act (820 ILCS 320/10 (West 2000)) to mean any injury resulting in a line-of-duty disability under section 4—110 of the Illinois Pension Code (Code) (40 ILCS 5/4—110 (West 2000)). We affirm.

## I. BACKGROUND

In June 2000, plaintiff was awarded a line-of-duty disability pension by the Board based on injuries he sustained while performing his duties as a firefighter for the City. Later that month, plaintiff requested that the City continue to pay the health insurance premiums for him and his family pursuant to section 10 of the Act, which provides, in part: "An employer who employs a full-time *** firefighter, who *** suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee," his spouse, and dependent children. 820 ILCS 320/10(a) (West 2000). The City countered it was not required to pay premiums for plaintiff and his family because "a line[-]of[-]duty injury is not equivalent to suffering a 'catastrophic' injury."

In October 2000, plaintiff filed a complaint for declaratory judgment, seeking an order from the trial court that he was entitled to have the health insurance premiums for him and his family paid by the City pursuant to section 10 of the Act. 820 ILCS 320/10 (West 2000). The complaint alleged the purpose of section 10 was "to protect all firefighters who are receiving a duty-related disability without limitation on the nature of the injury."

In January 2001, the trial court conducted a hearing on plaintiff's complaint. The issue before the court was whether plaintiff had suffered a "catastrophic injury" as defined by the Act. Plaintiff maintained the phrase "catastrophic injury" was ambiguous and required the court to determine the legislative intent to determine its meaning. Specifically, plaintiff argued the trial court should consider the comments made by Senator Laura Kent Donahue in the November 1997 legislative debate to override Governor Edgar's veto of House Bill 1347, which became the Act at issue here. Senator Donahue stated, in part: "I'd like to say for the sake of the record what we mean by catastrophically injured. What it means is that it is our intent to define 'catastrophically injured' as a police officer or firefighter who, due to injuries, has been forced to take a line-of-duty disability." 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue).

In March 2001, the trial court, in its order construing section 10 of the Act, stated the parties agreed plaintiff sustained an injury while performing his duties as a firefighter and as a result was permanently injured. The trial court found in favor of plaintiff stating, in part:

> "Because the term, 'catastrophically injured' is not defined, the [c]ourt has reviewed the legislative debate to determine the intent and meaning of this language. The legislative debate clearly indicates that those individuals (a firefighter in this case) who are disabled in the line of duty are entitled to have their health insurance premiums paid by the employer (in this case the City of Bloomington)."

This appeal followed.

## II. ANALYSIS

The City argues the trial court erred in construing section 10 of the Act to require it to pay plaintiff's health insurance premiums after plaintiff was disabled in the line of duty. We disagree.

■ Statutory construction is a matter of law and appellate review is *de novo. People v. Slover*, 323 Ill. App. 3d 620, 623, 753 N.E.2d 554, 557 (2001). The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Latona*, 184 Ill. 2d 260, 269, 703 N.E.2d 901, 906 (1998). The words of a statute

are to be given their plain and commonly understood meanings. *Panhandle Eastern Pipe Line Co. v. Environmental Protection Agency*, 314 Ill. App. 3d 296, 301, 734 N.E.2d 18, 22 (2000). When the language of a statute is clear and unambiguous, it will be given effect without resort to the other tools of statutory construction. *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 431, 732 N.E.2d 488, 494 (2000).

■ Section 10 of the Act provides, in part:

"An employer who employs a full-time *** firefighter, who *** suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority ***. ***

\* \* \*

(b) In order for the *** firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the *** firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act. Nothing in this [s]ection shall be construed to limit health insurance coverage or pension benefits for which the officer, firefighter, spouse, or dependent children may otherwise be eligible." 820 ILCS 320/10 (West 2000).

■ The term "catastrophic injury" is not defined by the Act. Thus, we must look elsewhere to determine the intent of the legislature. In its brief, the City correctly states that a statute is not interpreted by the statements or comments of legislators; rather, " 'a statute is interpreted by its language, *which if certain and unambiguous*, must be given effect as written.' " (Emphasis added.) *Chicago SMSA Ltd. Partnership v. Department of Revenue*, 306 Ill. App. 3d 977, 986, 715 N.E.2d 719, 726 (1999), quoting *People v. James*, 246 Ill. App. 3d 939, 948, 617 N.E.2d 115, 120 (1993). Here, however, the intent of the language of the Act is uncertain and ambiguous. Such ambiguity leads us to consider the legislative history in order to reach the end result in this case. See *People v. Rose*, 268 Ill. App. 3d 174, 178, 643 N.E.2d 865, 868 (1994) (where a statute's language is ambiguous, examination of legislative history is appropriate).

As the trial court did, we note that Senator Donahue, for the sake of the record, stated the legislature intended to define those " 'catastrophically injured' as *** police officer[s] or firefighter[s] who, due to injuries, [have] been forced to take a line-of-duty disability." 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue). In determining legislative intent, courts

may "consider relevant statements by legislators concerning the nature and effect of the proposed law." *Rose*, 268 Ill. App. 3d at 178, 643 N.E.2d at 868. The comments made by Senator Donahue, the bill's sponsor, should not be discounted by the judiciary in determining legislative intent when the remarks were purposefully included in the record for the sole reason of specifying legislative intent. Consideration of legislative debates is a legitimate and beneficial source for determining the intent of the legislature. See *People v. Billingsley*, 67 Ill. App. 2d 292, 297, 213 N.E.2d 765, 768 (1966) (committee comments are an appropriate and valuable source for determining legislative intent). As the fundamental purpose of statutory construction is to ascertain the intent of the legislature, the trial court's review of the transcripts of the legislative debate was appropriate.

We are mindful the First District Appellate Court has reached a decision contrary to our holding today. See *Villarreal v. Village of Schaumburg*, 325 Ill. App. 3d 1157, 759 N.E.2d 76 (2001). In *Villarreal*, a police officer injured in the performance of his official duties for the defendant village sought benefits under the Act. *Villarreal*, 325 Ill. App. 3d at 1159, 759 N.E.2d at 78. The First District cited a federal statute in assigning its own definition to the term "catastrophic injury" and also reviewed the laws of other states. *Villarreal*, 325 Ill. App. 3d at 1164, 759 N.E.2d at 82-83. It is unclear whether the floor debates from the Illinois Senate were ever brought to the court's attention, but the court concluded the language of the act was clear and unambiguous and eschewed extrinsic aids of statutory construction for interpretive guidance.

■ We conclude the meaning of the term "catastrophic injury" necessarily sets the parameters of the legislative enactment, and, as such, the term's uncertain definition renders the Act ambiguous.

In the case *sub judice*, the dissent criticizes the majority for ignoring *Town of the City of Bloomington v. Bloomington Township*, 233 Ill. App. 3d 724, 599 N.E.2d 62 (1992). 329 Ill. App. 3d at 1139. *City of Bloomington*, however, was not a case where legislative debates were examined to construe the meaning of a statute. Instead, the defendant, Bloomington Township, offered the expert testimony of the executive director of the Township Officials Association of Illinois to opine on the legislative intent of a statute. *City of Bloomington*, 233 Ill. App. 3d at 735, 599 N.E.2d at 69. The court correctly rejected the evidence as improper for determining legislative intent. *City of Bloomington*, 233 Ill. App. 3d at 735, 599 N.E.2d at 69. The *dicta* cited by the dissent, however, have no application here.

The questions posed in the dissent suggest the senators expected no deference to be given to the chief sponsor in defining the term

"catastrophic injury." 329 Ill. App. 3d at 1139. Thus, we pose our own rhetorical question: does our dissenting colleague really believe the senators intended for the definition assigned by the chief sponsor of the bill to be ignored in favor of whatever definition the judiciary assigned to the term?

■ In his epilogue, our dissenting colleague suggests the legislature can amend the Act to apply to future disabled line-of-duty victims but the Act provides no relief for plaintiff in this case. 329 Ill. App. 3d at 1143. We choose to grant plaintiff the benefits the legislature intended for him to receive. We simply assign the same meaning to "catastrophic injury" as that assigned by the bill's chief sponsor in floor debate before the full Senate, the media, and the public in a forum where every word is recorded and preserved for public and judicial scrutiny. We trust the policymakers will amend the statute and make it more limiting if the chief sponsor's definition of "catastrophic injury" is not acceptable.

Clearly, the Illinois General Assembly sought to fulfill an important state interest by enacting this statute providing additional benefits for the state's public safety officers. The legislative branch of government is responsible for making public policy, and the judiciary should give effect to enactments by the legislature establishing public policy. Here, there is no challenge of constitutional infirmity, and our deference to the clearly expressed will of the legislature is required. Accordingly, plaintiff is entitled to the insurance benefits sought for himself and his family.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, J., concurs.

JUSTICE STEIGMANN, dissenting:

The City argues that the trial court erred by equating "catastrophic" injury under section 10 of the Act (820 ILCS 320/10 (West 2000)) with a line-of-duty disability under section 40 of the Code (40 ILCS 5/4—110 (West 2000)). Because I agree, I respectfully dissent.

In my judgment, the majority opinion is wrong because (1) it gives inappropriate weight to the remarks of a single legislator, (2) it fails to properly analyze the term "catastrophic injury," and (3) it fails to consider how other jurisdictions have defined that term in similar contexts. I will discuss each of these failings in turn.

## I. THE ILLEGITIMACY OF "LEGISLATIVE HISTORY"

The majority writes that because the term "catastrophic injury" is not defined in the Act, it "must look elsewhere to determine the intent of the legislature." 329 Ill. App. 3d at 1136. The problem, however, is that the majority—like the trial court—begins and ends its inquiry by focusing solely on the remarks of Senator Donahue. To the extent that such remarks can ever properly be deemed "legislative history," I reject the notion that this court can rely on them in construing section 10 of the Act (820 ILCS 320/10 (West 2000)).

As Justice Scalia has written, "[t]he greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff*, 507 U.S. 511, 519, 123 L. Ed. 2d 229, 238, 113 S. Ct. 1562, 1567 (1993) (Scalia, J., concurring).

In support of its use of this "legislative history," the majority cites *People v. Rose*, 268 Ill. App. 3d 174, 178, 643 N.E.2d 865, 868 (1994), for the proposition that courts may consider relevant statements by legislators concerning the nature and effect of a proposed law. However, the majority ignores *Town of the City of Bloomington*, 233 Ill. App. 3d at 736, 599 N.E.2d at 70, in which this court wrote the following:

> "[L]egislators do not make laws by making speeches on the floor of the legislative chamber or by writing memos for committee meetings. They make laws by majority vote on a specifically worded bill that has been read three times before each house and distributed to each legislator. (Ill. Const. 1970, art. IV, §§ 8(c), (d).) Neither the disclosed nor undisclosed intent of a legislator or lobbyist becomes *law*; only the bill as it reads when passed becomes law." (Emphasis in original.)

Thus, by considering comments made during legislative debates, the trial court considered as dispositive a factor this court in *City of Bloomington* held should not be considered at all in construing statutes. Now the majority repeats the error.

If the majority is correct in relying upon the comments of an individual legislator, in this case Senator Donahue, as an appropriate source for determining legislative intent, then the majority should address the following questions that its reliance raises: (1) How many senators were present in the Senate when Senator Donahue spoke? (2) How many senators were aware that Senator Donahue placed the definition of "catastrophic injury" in her statements discussing the bill rather than in the bill's express language? (3) Assuming a given senator was aware, how does anyone know whether that senator agreed with Senator Donahue's remarks? (4) If a given senator heard Senator Donahue's remarks and did not agree with them, does not the major-

ity opinion place a burden on that senator to step forward and say so, or forever let the remarks of Senator Donahue be cited by the judiciary as "the will of the Senate?" (5) If this is to be the rule of statutory construction, then how many Illinois legislators are aware that they remain silent at their peril if they disagree with the views of those legislators motivated to speak about the legislation pending before the chamber?

The majority's approach seriously misconstrues the purpose of legislative debate. That purpose ought not to be to provide language either intentionally or inadvertently left out of the bill being considered. Instead, that purpose should be to persuade legislators who might have doubts about a bill to vote for it. And even then, legislative debates should always be conducted with the understanding that courts will have the last word, in determining what the bill means, based upon the *written language contained within the bill*.

This case illustrates the wisdom of the tenet that courts should not consider legislative debates in construing statutes. See *City of Bloomington*, 233 Ill. App. 3d at 736, 599 N.E.2d at 70 ("[n]either the disclosed nor undisclosed intent of a legislator or lobbyist becomes *law*; only the bill as it reads when passed becomes law" (emphasis in original)). The oral remarks of Senator Donahue show just how easy it would have been for the legislature to have defined "catastrophic injury" within the text of section 10 of the Act (820 ILCS 320/10 (West 2000))—assuming, of course, that her fellow legislators would have agreed with Senator Donahue if that language actually appeared in House Bill 1347. For example, that bill could have contained the following language: "For purposes of this section, 'catastrophically injured' means a police officer or firefighter who, due to injuries, has been forced to take a line-of-duty disability." However, the bill the legislature passed did not include that language, and even though that language might constitute desirable policy, this court is limited to interpreting the statute as it is written. See *City of Springfield v. Judith Jones Dietsch Trust*, 321 Ill. App. 3d 239, 245, 746 N.E.2d 1272, 1277 (2001) (a court must not rewrite a statute to make it consistent with the court's idea of orderliness and public policy).

## II. PROPER ANALYSIS OF THE TERM "CATASTROPHIC INJURY"

Although section 10 of the Act refers to "catastrophic injury," it does not define that term. However, the reference to "catastrophic injury" manifests the legislature's belief that injury can be measured by degrees.

The Oxford English Dictionary defines "catastrophic" as "[o]f the

nature of, or belonging to, a catastrophe." 2 Oxford English Dictionary 972 (2d ed. 1989). Merriam-Webster's Collegiate Dictionary defines "catastrophe" as "a momentous tragic event ranging from extreme misfortune to utter overthrow or ruin." Merriam-Webster's Collegiate Dictionary 179 (10th ed. 1998). The Oxford English Dictionary defines "catastrophe" as "[a] sudden disaster, wide-spread, very fatal, or signal." 2 Oxford English Dictionary 972 (2d ed. 1989). The American Heritage Dictionary provides that the term "catastrophe" "especially stresses the sense of tragic outcome with irreparable loss." American Heritage Dictionary 374 (1975).

Viewing injuries on a continuum from minor to fatal, a "catastrophic injury" under section 10 of the Act (820 ILCS 320/10 (West 2000)) would have to fall somewhere toward the end of the continuum—that is, it would have to be some type of extreme, irreparable injury short of death. Although I cannot definitively say what "catastrophic injury" means in all cases, I am confident that whatever it means, it means something more than a duty-related injury which qualifies a firefighter for a line-of-duty disability pension. A firefighter is eligible for such a pension if, "as the result of *** injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty," he is found to be "physically or mentally permanently disabled for service in the fire department." 40 ILCS 5/4—110 (West 2000). Thus, section 40 of the Code encompasses any injury that prevents a firefighter from serving as a firefighter. Although an "injury" under section 40 may constitute a "catastrophic" injury, an injury under that section does not have to be "catastrophic" to qualify a firefighter for a line-of-duty disability. In other words, a firefighter may sustain a duty-related injury that prevents him from serving as a firefighter without sustaining a "catastrophic" injury.

This interpretation of section 10 of the Act (820 ILCS 320/10 (West 2000)) is supported by section 4—112 of the Code (40 ILCS 5/4—112 (West 2000)), which provides that a firefighter under the age of 50 who is receiving a line-of-duty disability pension must undergo yearly medical examinations to verify that his disability is a continuing one. If the Board is presented with satisfactory proof that a firefighter has recovered from his disability, the Board will terminate his line-of-duty disability pension, and the firefighter will be reinstated into active service. 40 ILCS 5/4—112 (West 2000). It would make no sense to interpret a "catastrophic" injury under section 10 of the Act (820 ILCS 320/10 (West 2000)) as meaning any injury resulting in a line-of-duty disability, when such a disability may be temporary. See American Heritage Dictionary 374 (1975) ("Catastrophe especially stresses the sense of tragic outcome with *irreparable* loss" (emphasis added)).

Such an interpretation would render the word "catastrophic" superfluous. See *People v. Richardson*, 196 Ill. 2d 225, 228, 751 N.E.2d 1104, 1106 (2001) ("a statute should be construed so that no word or phrase is rendered superfluous or meaningless").

## III. HOW OTHER JURISDICTIONS HAVE DEFINED "CATASTROPHIC INJURY"

In *Villarreal v. Village of Schaumburg*, 325 Ill. App. 3d 1157, 1163-64, 759 N.E.2d 76, 82 (2001), the First District Appellate Court held that the plaintiff, who was employed as a police officer by the defendant village, did not suffer a "catastrophic injury" under section 10 of the Act where he was found to be fully disabled from serving on a police department and thus qualified for retirement from service. In so concluding, the First District analyzed the term "catastrophic injury" much as did Part II of this dissent and concluded that the plaintiff's injury had "not rendered him incapable of engaging in *any* gainful employment." (Emphasis in original.) *Villarreal*, 325 Ill. App. 3d at 1163, 759 N.E.2d at 81.

The First District noted that its decision required no resort to extrinsic aids of statutory construction for interpretative guidance because, in its judgment, the language of the Act was clear and unambiguous. The court noted, however, that because the case before it was one of "first impression in Illinois, we believe it is beneficial to briefly look at the term 'catastrophic injury' as it has been defined by other jurisdictions." *Villarreal*, 325 Ill. App. 3d at 1164, 759 N.E.2d at 82. The court then cited the language of the Public Safety Officers' Benefits Act of 1976 (42 U.S.C. § 3796(b) (1994)), as providing that " 'catastrophic injury' means consequences of an injury that permanently prevent an individual from performing any gainful work." *Villareal*, 325 Ill. App. 3d at 1164, 759 N.E.2d at 82. The *Villarreal* court deemed that definition "consistent with the plain and commonly understood meaning of 'catastrophic injury' we have discussed." *Villarreal*, 325 Ill. App. 3d at 1164, 759 N.E.2d at 82.

The First District then looked to similar state statutes from Florida, Georgia, and North Dakota (Fla. Stat. Ann. § 440.02(37) (West Supp. 2002); Ga. Code Ann. § 34—9—200.1(g) (1998); N.D. Cent. Code § 65—05.1—06.1(2)(c) (1995)) and found all of these statutes to support the interpretation it applied to section 10 of the Act. *Villarreal*, 325 Ill. App. 3d at 1164-65, 759 N.E.2d at 82-83.

I find the First District's analysis in *Villarreal* is quite sound, and in addition to the other reasons I have already discussed in this dissent, I deem that analysis another basis for reversing the trial court's judgment.

## IV. THE LIMITED ISSUE BEFORE THIS COURT

It should be emphasized that—despite Krohe's suggestion to the contrary—the issue before this court is not whether Krohe's specific duty-related injuries constituted "catastrophic injuries." Krohe's complaint did not allege the factual details of his injury, other than to state that the Board had determined that he "was permanently disabled from performing his duties as a firefighter by reason of injuries sustained in the cause of performing acts of duty." Further, the trial court made no findings of fact regarding the extent or impact of Krohe's injuries or whether his injuries in fact constituted "catastrophic injuries." Instead, the court determined only that "those individuals (a firefighter in this case) who are disabled in the line of duty are entitled to have their health insurance premiums paid by the employer (in this case the City of Bloomington)." This court is thus limited to the precise issue before us—namely, whether the trial court erred by interpreting "catastrophic injury" under section 10 of the Act (820 ILCS 320/10 (West 2000)) as meaning any injury resulting in a line-of-duty disability under section 40 of the Code (40 ILCS 5/4—110 (West 2000)).

## V. EPILOGUE

The recent tragic death of hundreds of New York firefighters, police officers, and emergency medical technicians served as a jolting reminder of the bravery and dedication of these men and women. When duty called, they ran to the burning World Trade Center towers, and many died as a result. This court joins our fellow Americans in saluting these dedicated public servants—here in central Illinois as well as in New York City—and we might well wish to see section 10 amended to reflect the intention of Senator Donahue so that injured firefighters and their families would have the additional financial protection such an amendment would provide. Nonetheless, we are duty-bound to interpret section 10 as it is written, not as we would prefer it to read, however much we might prefer a different result.